**HIRAM WALKER & SONS, INC.,**
**Plaintiff–Appellant,**

v.

**KIRK LINE, R.B. KIRKCONNELL & BRO., LTD., et al., Defendants,**

**Eller & Company, Inc. Defendant–Appellee.**

**No. 90–5699.**

United States Court of Appeals, Eleventh Circuit.

June 17, 1992.

John P. D'Ambrosio, Irvington, N.Y., for plaintiff-appellant.

Craig D. Olmstead, Christian D. Keedy, Miami, Fla., for defendant-appellee.

Before TJOFLAT, Chief Judge, DUBINA, Circuit Judge, and HENDERSON, Senior Circuit Judge.

TJOFLAT, Chief Judge:

Hiram Walker & Sons, Inc. (Hiram Walker) appeals from a final judgment of the United States District Court for the Southern District of Florida holding that Eller & Company, Inc. (Eller), a stevedore and terminal operator, was an "independent contractor performing services" for R.B. Kirkconnell & Bro., Ltd. (Kirk Line), an ocean carrier, and therefore entitled to limit its liability to $500 under section 4(5) of the Carriage of Goods by Sea Act, ch. 229, 49 Stat. 1207 (1936) (codified as amended 46 U.S.C.App. § 1304(5) (1988)) (COGSA).

We reverse and remand for proceedings in accordance with this opinion.

## I.

Hiram Walker sued Eller, among others, to recover for the loss of a shipment of five thousand gallons in bulk of Tia Maria Liqueur. On appeal from the district court's summary judgment against Eller, we held Eller liable as a matter of law, but reversed and remanded, instructing the district court to determine whether Eller functioned as an "independent contractor performing services" for Kirk Line at the time of the spill and therefore was entitled to a $500 liability cap. *Hiram Walker & Sons, Inc. v. Kirk Line*, 877 F.2d 1508, 1516 (11th Cir. 1989). We specifically called on the district court to "determine after trial whether Kirk Line's obligations had completely terminated by the time of the spill...." *Id.* at 1517.

For a more detailed rendition of the accident, that triggered this case, we turn to our prior opinion:

Hiram Walker purchased five thousand gallons of Tia Maria from Estate Industries in Jamaica on March 15, 1985. On March 26, a twenty-three ton tank containing the liqueur was loaded aboard the M/V *Morant Bay* in Kingston, apparently in good order. Kirk Line had chartered the *Morant Bay* from its proprietor, [Jamaica Merchant Marine Atlantic Line, Ltd. (Jamaica Line) ], for a shipment of cargo including Hiram Walker's liqueur, which was shipped under the Kirk Line–Hiram Walker bill of lading. The tank arrived in Miami three days later. Kirk Line hired Eller, a stevedore, to unload the tank from the *Morant Bay* and store it at the dock.

Hiram Walker contracted with [Indian River Transport, Inc. (Indian River)] to transport the liqueur overland to New Jersey; Hiram Walker and Indian River agreed that Indian River was to pump the liqueur from the tank into its freight trailer. On April 1, Jones, an employee of Indian River, arrived at the port to effect the pumping transfer. An Eller employee removed the tank from storage and aligned it with the trailer. Jones attempted to connect the tank and the trailer, but realized that a fitting needed to connect the hoses was missing. Even though another fitting on the back of the tank might have been used to pump the liqueur into the trailer, Jones decided that pumping the liqueur would be impossible; therefore, he asked Marshall, an Eller employee, to help him accomplish a "gravity feed"—essentially, Jones wanted to pour the liqueur from the tank to the trailer. To effect a gravity feed, the tank had to be elevated higher than the trailer. Marshall directed another Eller employee, Wright, to assist Jones. Wright lifted the tank on a large forklift; Wright, however, was not licensed to operate forklifts of this capacity.

Wright and Marshall neglected to put straw mats or other dunnage between the metal forks and the metal container. Fifteen minutes into the operation, the tank apparently began to slide off the forks because of the lack of dunnage. Deciding that the tank was not properly balanced, Marshall instructed Wright to find another forklift. Wright did not lower the tank, but left the forklift holding the tank suspended eight feet off the ground for ten minutes; leaving a load suspended was a violation of standard company procedure. As Wright returned, the tank fell off the forklift. The tank ruptured, and eighty-five percent of the Tia Maria in the tank spilled out. The liqueur remaining in the tank was contaminated during the clean-up, in which several fire-engine companies covered the area with anti-explosive foam. *Hiram Walker*, 877 F.2d at 1510–11.

On remand, the district court determined after trial that Kirk Line's obligations had not completely terminated by the time of the spill. It found that Eller was an "independent contractor performing services" under the "Himalaya" clause in Kirk Line's bill of lading with Hiram Walker, which limits liability to $500 "per customary freight unit" and provides that the "limitation of liability [to $500 per unit] shall inure ... to the benefit of any independent contractors performing services including stevedoring in connection with the goods covered hereunder."[1] The bill of lading's clause paramount further incorporated COGSA, which also limits liability to $500 for any "customary freight unit."[2] Since

---

**1.** Clause 17 provides in pertinent part:

In the case of any loss or damage to or in connection with goods exceeding in actual value $500 lawful money of the United States per package, or, in case of goods not shipped in packages per customary freight unit the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and the Carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit or pro rata, in case of partial loss or damage, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the Carrier and inserted in this bill of lading and extra freight paid if required and in such case if the actual value of the goods per package or per customary freight unit shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the Carrier's liability, if any, shall not exceed the declared value and any

partial loss of damage shall be adjusted pro rata on the basis of such declared value.

. . . .

The limitation of liability and other provisions contained in the article shall inure not only to the agents, servants and employees, but also to the benefit of any independent contractors performing services including stevedoring in connection with the goods covered hereunder.

**2.** In pertinent part, section 4(5) of COGSA provides:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment

the dropped tank of Tia Maria constituted a customary freight unit, *see Hiram Walker*, 877 F.2d at 1510, the district court capped Eller's liability at $500.

The district court made extensive findings of fact, all of which we accept as not clearly erroneous. The court found that, although "[a]ccording to an oral agreement between Hiram Walker and Indian River, Indian River was responsible for pumping the Tia Maria cargo into its trailer[,] Hiram Walker had no agreement with Indian River regarding how the liqueur should be transferred if it were not pumped." The court further found that "Hiram Walker's agreement with Kirk Line is contained in bill of lading number 9, which contains no provision regarding the method for transferring the liqueur from Tank 24 to the Indian River trailer." The court noted, however, that clause 18 of the bill of lading provides that "removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage

... shall be prima facie evidence of the delivery by the Carrier of the goods as described in the bill of lading." Finally, the court found that "[b]efore the accident, an Eller employee issued a delivery receipt to the Indian River driver, stating that the cargo was 'pumped out of Tank # 24 (as per manifest),'" but that "[n]o gate pass was issued."

At the outset of its conclusions of law, the district court correctly acknowledged that "[t]his action is governed by the terms of the bill of lading issued for Tank 24 and the provisions of COGSA." Guided by our prior opinion in this case,[3] the district court also correctly identified delivery as the linchpin of the question we had instructed it to address. In order to determine the time at which Kirk Line's obligations had completely terminated, it would have to pinpoint the time at which delivery had occurred.[4]

The court stumbled not in charting its road, but in traveling it. Explicitly dis-

and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

46 U.S.C. app. § 1304(5) (1988).

3. The question thus presented is whether Kirk Line's duty was fulfilled when Eller aligned the tank with Indian River's truck; if so, Kirk Line had completed its responsibilities under the bill of lading before the spill had occurred, and Eller could not be said to have been an "independent contractor performing services" under the bill of lading at the time of the accident. If, however, because of Indian River's failure to secure the proper fitting, *delivery* was not completed by the mere alignment of the tank with the trailer, then Kirk Line's *duty of delivery* would have continued and Eller would have been "an independent contractor performing services" under the bill of lading at the time of the spill, entitled to the $500 limitation.

*Hiram Walker & Sons, Inc. v. Kirk Line*, 877 F.2d 1508, 1516 (11th Cir.1989) (emphasis supplied).

4. Eller argues that custody change, not delivery, constitutes the relevant occurrence for determining the scope of Kirk Line's obligations to Hiram Walker. In support, Eller points to the clause paramount of the bill of lading, which provides that "[t]he provisions stated in [COGSA] (except as may be otherwise specifically provided herein) shall govern before the goods are loaded on and after they are discharged

from the ship and throughout the entire time the goods are in the *custody* of the carrier." (Emphasis supplied.) In its findings of fact, the district court did opine that "[u]nder the clause paramount, Kirk Line's liability to Hiram Walker is limited to $500 per package during the entire time period that Kirk Line had *custody* of Tank 24." (Emphasis supplied.) In its conclusions of law, however, the court focussed not on the clause paramount, but on clause 18 of the bill of lading, and sought to determine whether delivery, not custody change, had occurred at the time of the spill. Although the court considered absence of custody change conclusive evidence of absence of delivery and conflated the two occurrences in the process, *see infra* pp. 330–32, it nevertheless set out ultimately to determine the point of delivery, not of custody change. Our previous opinion specifically instructed the district court to determine the point of delivery, *Hiram Walker*, 877 F.2d at 1516, and we see no reason now to shift the focus onto custody. While the clause paramount rendered COGSA applicable until the point of custody change, the district court specifically found that "the parties agreed [in clause 18] that actual *delivery* of the cargo would be required before Kirk Line's responsibilities ended." (Emphasis supplied.) Although COGSA remained applicable following delivery, but prior to change of custody, Eller could at that time no longer claim the benefit of the damage cap in section 4(5) of COGSA and in clause 17 of the bill of lading, because it was no longer an "independent contractor performing services" for Kirk Line.

regarding its fact finding that a delivery receipt was issued, the court mistakenly interpreted the quoted language in clause 18 of the bill of lading as compelling the conclusion that Eller had not completed delivery at the time of the spill: "Considering [the quoted] language, the court concludes that delivery did not occur before the accident, because Indian River had not removed the Tia Maria from Tank 24 into its custody. By linking delivery to custody, the parties agreed that actual delivery of the cargo would be required before Kirk Line's responsibilities ended."

The court's reading of clause 18 turned on an incorrect interpretation of the phrase "prima facie evidence." The court, in effect, took clause 18 as identifying change of custody not only as conclusive, but also as the only possible evidence of delivery.[5] While clause 18 did link custody to delivery, it did not equate the two at the exclusion of all other possible evidence of delivery. It was only the court's improperly categorical reading of clause 18 that permitted it to ignore the delivery receipt as evidence of delivery. Clause 18 does not concern itself with the question of when delivery has not occurred, but with the question of when delivery *has* occurred. Absence of custody change, however, implies absence of delivery only if delivery cannot occur without a change in custody. Clause 18, of course, says no such thing.

Instead of identifying custody change as the *conditio sine qua non* of delivery, it marks custody change as *primus inter pares* of all possible evidence of delivery.[6]

Once the connection between custody change and delivery is loosened in this way, it becomes apparent that the absence of custody change does not compel a finding of absence of delivery. By the terms of the bill of lading, absence of custody change simply means that the prima facie evidence of delivery identified in clause 18 is not available. We therefore look to other evidence of delivery and come upon the delivery receipt issued prior to the spill. Once it is agreed that delivery does not stand or fall on custody change, the absence of a gate pass—which would have constituted conclusive evidence of change of *custody*—does little to question the status of the delivery receipt as evidence, though perhaps not prima facie evidence, of *delivery*.

Hiram Walker concedes that Eller had custody at the time of the spill. Assuming that Eller had custody and that therefore no custody change had occurred that would have constituted prima facie evidence of delivery,[7] we search the district court's fact findings in vain for indications that the delivery receipt documented anything other than delivery. The passing remark that "[t]he mere fact that a delivery receipt issued does not persuade the court that

---

5. It is well settled that prima facie evidence differs from both conclusive evidence, and the only possible evidence, of a given occurrence. *See, e.g., Associated Metals and Minerals Corp. v. Etelae Suomin Laiva*, 858 F.2d 674, 677–78 (11th Cir.1988) (interpreting COGSA § 3(6); prima facie evidence "accorded no special weight" upon introduction of sufficient contrary evidence) (quoting *Harbert Int'l Establishment v. Power Shipping*, 635 F.2d 370, 373 (5th Cir. Unit B 1981)); *Miller v. Norvell*, 775 F.2d 1572, 1574 (11th Cir.1985), *cert. denied*, 476 U.S. 1126, 106 S.Ct. 1995, 90 L.Ed.2d 675 (1986) ("Prima facie evidence means evidence of such nature as is sufficient to establish a fact and which, if unrebutted, remains sufficient for that purpose."). The very COGSA provision the benefit of which Eller seeks distinguishes prima facie from conclusive evidence:

   Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transpor-

tation of goods in an amount exceeding $500 per package ..., unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be *prima facie* evidence, but shall not be *conclusive* on the carrier. 46 U.S.C.App. § 1304(5) (emphasis supplied).

6. Strictly speaking, more than one occurrence may constitute prima facie evidence of another.

7. Hiram Walker, somewhat self-defeatingly, urges us to find that Kirk Line no longer had custody at the time of the spill. In conjunction with Hiram Walker's concession that Eller had custody at the time of the spill, this finding would make for a change of custody, which in turn would constitute prima facie evidence of delivery. In that case, however, Kirk Line's obligations would have terminated long before the spill, namely at the moment custody transferred from Kirk Line to Eller.

actual delivery occurred" will not do once the custody determination is stripped of its dispositive pretenses.

We refrain from making a factual determination regarding the point of delivery, which is better left to the district court. On remand, we instruct the district court to develop any facts that would aid it in making this determination, including, for example, the precise time at which the delivery receipt was issued. Issuance of the delivery receipt prior to the time Hiram Walker claims delivery was completed—the moment the tank had been aligned with the trailer—might lessen the delivery receipt's probative value. A finding that Indian River and Eller customarily, or by agreement, completed delivery receipts prior to delivery could have a similar effect.

## II.

For the above stated reasons the judgment of the district court is REVERSED and the case is REMANDED for proceedings in accordance with this opinion.

REVERSED AND REMANDED.