30 F.3d 1370
 1995 A.M.C. 879
 HIRAM WALKER & SONS, INC., Plaintiff-Appellant,
v.
KIRK LINE, R.B. Kirkconnell & Bro. Ltd.; Jamaica Merchant
Marine, Atlantic Line Ltd.; Eller & Company, Inc.; Indian
River Transport, Inc.; and SS Morant Bay, its engines,
boilers, etc., Defendants-Appellees.
 No. 93-4346.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 1, 1994.
 
 John P. D'Ambrosio, Irvington, NY, for appellant.
 Christian D. Keedy, Kelley Drye & Warren, Miami, FL, for appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before TJOFLAT, Chief Judge, DUBINA, Circuit Judge, and RONEY, Senior Circuit Judge.
 RONEY, Senior Circuit Judge:
 
 
 1
 At issue in this case is whether Eller & Co., Inc., a stevedore and terminal operator, was in the process of delivering cargo on behalf of an ocean carrier, R.B. Kirkconnell & Bro. Ltd. (Kirk Line) when it negligently destroyed the cargo in a forklift accident. The district court, following remand, made certain factual findings and reinstated its earlier judgment, holding that delivery was ongoing at the time of the accident, and that, as a result, Eller's liability was limited to $500 under the Carriage of Goods by Sea Act, 46 U.S.C.App. Sec. 1304(5), as incorporated into the bill of lading between Kirk Line and the cargo's owner, Hiram Walker & Sons, Inc. (Hiram Walker). Hiram Walker appeals the limitation of Eller's liability, contending that the underlying factual findings are clearly erroneous. We affirm.
 
 I.
 
 2
 This case is before us for the third time. To understand its current posture, it is necessary to review the factual and procedural background in some detail. We begin by reciting the facts as set forth in our prior opinions:
 
 
 3
 Hiram Walker purchased five thousand gallons of Tia Maria from Estate Industries in Jamaica on March 15, 1985. On March 26, a twenty-three ton tank containing the liqueur was loaded aboard the M/V Morant Bay in Kingston, apparently in good order. Kirk Line had chartered the Morant Bay ... for a shipment of cargo including Hiram Walker's liqueur, which was shipped under the Kirk Line-Hiram Walker bill of lading. The tank arrived in Miami three days later. Kirk Line hired Eller, a stevedore, to unload the tank from the Morant Bay and store it at the dock.
 
 
 4
 Hiram Walker contracted with [Indian River Transport, Inc. (Indian River) ] to transport the liqueur overland to New Jersey; Hiram Walker and Indian River agreed that Indian River was to pump the liqueur from the tank into its freight trailer. On April 1, Jones, an employee of Indian River, arrived at the port to effect the pumping transfer. An Eller employee removed the tank from storage and aligned it with the trailer. Jones attempted to connect the tank and the trailer, but realized that a fitting needed to connect the hoses was missing. Even though another fitting on the back of the tank might have been used to pump the liqueur into the trailer, Jones decided that pumping the liqueur would be impossible; therefore, he asked Marshall, an Eller employee, to help him accomplish a "gravity feed"--essentially, Jones wanted to pour the liqueur from the tank to the trailer. To effect a gravity feed, the tank had to be elevated higher than the trailer. Marshall directed another Eller employee, Wright, to assist Jones. Wright lifted the tank on a large forklift; Wright, however, was not licensed to operate forklifts of this capacity.
 
 
 5
 Wright and Marshall neglected to put straw mats or other dunnage between the metal forks and the metal container. Fifteen minutes into the operation, the tank apparently began to slide off the forks because of the lack of dunnage. Deciding that the tank was not properly balanced, Marshall instructed Wright to find another forklift. Wright did not lower the tank, but left the forklift holding the tank suspended eight feet off the ground for ten minutes; leaving a load suspended was a violation of standard company procedure. As Wright returned, the tank fell off the forklift. The tank ruptured, and eighty-five percent of the Tia Maria in the tank spilled out. The liqueur remaining in the tank was contaminated during the clean-up, in which several fire engine companies covered the area with anti-explosive foam.
 
 
 6
 Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508, 1510-11 (11th Cir.1989) (Hiram Walker I ).
 
 
 7
 Hiram Walker sued Eller, among others, for the loss of the cargo. In December 1986, the district court granted summary judgment in favor of Hiram Walker on the issue of liability, finding that Eller had been negligent as a matter of Florida law. The court also considered whether Eller was entitled to COGSA's $500 per container limitation on liability, which was incorporated into the bill of lading between Kirk Line and Hiram Walker, and which, pursuant to a "Himalaya" clause, "inure[d] to the benefit of any independent contractors performing services including stevedoring" for Kirk Line.[1] The court concluded that the $500 limitation did not apply because Eller, in performing the gravity feed, had acted as a volunteer, not as Kirk Line's independent contractor.
 
 
 8
 Eller appealed, and in Hiram Walker I, 877 F.2d at 1515-1517, we agreed with the district court that Eller's negligence had been established as a matter of law, but reversed the judgment because there remained unresolved factual issues regarding its eligibility for the $500 liability cap. Noting that the bill of lading required Kirk Line to deliver the cargo to Indian River, we held that Eller would be a beneficiary of the Himalaya clause as long as Kirk Line had not completely discharged that responsibility when the spill occurred. We remanded for trial, directing the district court to determine whether, at the time of the spill, delivery had already occurred. If not, then Eller had performed the gravity feed on Kirk Line's behalf and was entitled to the $500 limitation on liability. If delivery was complete, however, Eller would be deemed a volunteer and there would be no such limitation.
 
 
 9
 After the resulting bench trial, the district court again entered judgment in favor of Hiram Walker. This time, however, it limited Eller's liability to $500, finding that Kirk Line's responsibility for delivery under the bill of lading had not ended before the spill, and that Eller was therefore performing services on its behalf. Noting that the parties had not defined "delivery", the court made extensive findings of fact regarding the parties' agreements and practices. It found, for example, that although Hiram Walker and Indian River orally agreed that Indian River was responsible for pumping the cargo into its trailer, they had no agreement about how the cargo should be transferred if not pumped. The court found, moreover, that neither the bill of lading, which contained the carriage agreement between Hiram Walker and Kirk Line, nor the oral contract between Kirk Line and Eller for stevedoring and terminal services, specified the method of transferring the cargo to Indian River. From the trial testimony, however, the court determined that Kirk Line expected Eller to provide Indian River "with whatever services were necessary to effect a physical transfer the cargo", and that Eller had discretion to decide how best to accomplish that task. It further found that Eller had performed gravity transfers in approximately one-third of all deliveries, and that at least fifteen of those deliveries involved the use of a forklift.
 
 
 10
 In concluding that delivery was not complete before the spill, the district court placed special emphasis on Clause 18 of the bill of lading, which provided that "removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage ... shall be prima facie evidence of the delivery by the Carrier of the goods as described in the bill of lading." The court interpreted that language as precluding the possibility of delivery without a change of custody. Because it was undisputed that Eller had never transferred the cargo into Indian River's custody, the court held that delivery did not occur in this case. In so holding, the court explicitly disregarded evidence that Eller had issued a delivery receipt to Indian River before the accident.
 
 
 11
 Hiram Walker appealed that decision, and again this court reversed. Hiram Walker & Sons v. Kirk Line, 963 F.2d 327 (11th Cir.1992) (Hiram Walker II ). Although concluding that the district court's findings of fact were not clearly erroneous, we held that the court had misinterpreted the bill of lading as identifying change of custody as the only possible evidence of delivery. Id. at 331. We explained that although Clause 18 provided that change of custody would be prima facie evidence of delivery, Indian River's lack of custody at the time of the spill was not conclusive evidence that delivery had not occurred. Noting that other evidence, such as the delivery receipt, might establish that Kirk Line's delivery obligation was completed before the accident, the case was remanded with instructions that the district court develop any facts that would aid it in determining the point of delivery. We made clear, however, that the delivery receipt was not conclusive evidence of delivery and that its probative value would depend upon the circumstances of its issuance. Id. at 332.
 
 
 12
 On remand, the district court held a status conference at which both parties indicated they had no further evidence to present regarding delivery. Thereafter, the court amended its findings of fact and conclusions of law, stating that "the court has considered the significance of the delivery receipt, in accordance with the Eleventh Circuit's mandate, and has determined that the delivery receipt did not establish the point in time that 'legal delivery' took place." Relying on the trial testimony, the district court found that the issuance of the delivery receipt in this case was either inadvertent or erroneous because it was inconsistent with Eller's usual practice of issuing such receipts, along with gate passes, only after physical possession of the cargo has passed to the consignee. Because the receipt was issued in error, and there was no other compelling evidence that delivery was complete, the district court concluded that Eller was trying to effect delivery when the accident occurred, and that it was therefore entitled to the $500 limitation on liability. Hiram Walker has again appealed.
 
 II.
 
 13
 The sole issue in this appeal is whether the district court committed reversible error in finding that the delivery receipt was issued inadvertently or erroneously and was therefore not probative of delivery.[2]
 
 
 14
 As Hiram Walker acknowledges, the challenged finding is one of fact and is therefore reviewed only for clear error. Fed.R.Civ.P. 52. "This court will not disturb a district court's findings of fact under the clearly erroneous standard unless it is left 'with the definite and firm conviction that a mistake has been made' after making all credibility choices in favor of the fact-finder's choice, in light of the record as a whole." Meek v. Metropolitan Dade County, 985 F.2d 1471, 1481 (11th Cir.1993) (quoting Maddox v. Claytor, 764 F.2d 1539, 1545 (11th Cir.1985). If the district court's finding is plausible in light of the entire record, "the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 
 15
 Hiram Walker contends that the district court's finding is clearly erroneous because there is no evidence in the record that the delivery receipt was issued erroneously or that such receipts are customarily issued only after physical transfer of the cargo. This argument is baseless. The district court finding rests on the trial testimony of two Eller employees, Marvin Stephens and Jose Naranjo. Stephens, Eller's manager of operations at the time of the spill, testified as follows:
 
 
 16
 Q. Now on April 1, 1985, the incident took place where the Tia Maria was spilled. What function was Eller & Company performing at that period of time?
 
 
 17
 A. They were attempting to deliver the product to Indian River. (R9-61).
 
 
 18
 . . . . .
 
 
 19
 Q. Would the delivery have occurred upon the alignment of Tank 24 with the Indian River tank if Indian River could have pumped the cargo?
 
 
 20
 A. After it was cleared our gate, yes.
 
 
 21
 Q. What do you mean by that?
 
 
 22
 A. If all the proper documentation had been made and it was pumped and a gate pass was issued for it to leave our gate and leave the Port of Miami.
 
 
 23
 Q. Would delivery have occurred by aligning Tank 24 with trailer no. 24 [sic] when the pumping could not occur?
 
 
 24
 A. No. (R9-83-84).
 
 
 25
 . . . . .
 
 
 26
 Q. Is there a point in time when Eller's terminal services for Kirk Line ends that you are aware of, for the handling of cargo?
 
 
 27
 A. Yes, upon the issuance of a gate pass. (R9-83-84).
 
 
 28
 . . . . .
 
 
 29
 Q. Now you say a gate pass wasn't issued in this case, right?
 
 
 30
 A. That's right.
 
 
 31
 Q. Do you know if a delivery receipt was issued in this case?
 
 
 32
 A. I think I saw one.
 
 
 33
 Q. Is there a difference between the two?
 
 
 34
 A. Yes. The gate pass allows the unit to leave our facility.
 
 
 35
 Q. What's the function of the delivery receipt?
 
 
 36
 A. It is that the cargo has been delivered. (R9-93).
 
 
 37
 . . . . .
 
 
 38
 Q. Was it customary on a day-to-day basis for Eller & Company to sign delivery receipts and to get a receiver, a trucker, to sign a delivery receipt before delivery had been effected? That's my only question. Was that customary to do?
 
 
 39
 A. No.
 
 
 40
 Q. And yet it was done in this case, is that what you are suggesting.
 
 
 41
 A. Evidently. (R9-100-101).
 
 
 42
 . . . . .
 
 
 43
 Q. Were delivery receipts issued customarily with shipments of Tia Maria, that is coming into Miami and going off?
 
 
 44
 A. Yes.
 
 
 45
 Q. And when ordinarily were those issued?
 
 
 46
 A. Upon completion of the delivery of the cargo.
 
 
 47
 Q. And ordinarily the delivery of the cargo of bulk Tia Maria was done by pumping, isn't that correct?
 
 
 48
 A. Not all the time.
 
 
 49
 Q. But I mean customarily it was--
 
 
 50
 A. Not in this case.
 
 
 51
 Q. I know not in this case. Tank 24 was normally pumped out, wasn't it?
 
 
 52
 A. I would say probably at least a third of the time it was delivered by a gravity feed. (R9-103).
 
 
 53
 Stephens's testimony is clear: Eller, contrary to its custom, issued the delivery receipt to Indian River before completion of delivery, which in this case was being performed by gravity transfer. The court reasonably inferred that this departure from custom was a mistake, and that the receipt, therefore, did not establish the time delivery took place.
 
 
 54
 The testimony of Jose Naranjo, Eller's general traffic manager at the time of the accident, further supports the district court's finding:
 
 
 55
 Q. Were there times when the pumping couldn't be performed that you are aware of?
 
 
 56
 A. Yes sir, there were many times.
 
 
 57
 Q. At any time prior to April 1, 1985, what if anything did Eller do with the Tia Maria when a pump could not occur?
 
 
 58
 A. ... [W]e brought the tank from the lot, the container lot, and brought it alongside the Indian River truck where the tank was transferred through gravity. What we did very simply is we placed it at a higher level than the receiving tank. (R9-113-114).
 
 
 59
 Q. Do you think Eller was obligated to lift Tank 24 on the forklifts for this gravity feed in it contract with Kirk Line?
 
 
 60
 [objection omitted]
 
 
 61
 A. Eller's responsibility was to deliver the contents of Tank 24 to Indian River and they were to utilize whatever methods were necessary to complete the transfer.
 
 
 62
 Q. But lifting the tank with a forklift, was that an obligation Eller owed to Kirkconnell?
 
 
 63
 A. With a forklift or any other equipment that was available.... (R9-116).
 
 
 64
 . . . . .
 
 
 65
 Q. Please look at Plaintiff's Exhibit 11. Can you identify that for the court?
 
 
 66
 A. Yes sir. This is a delivery receipt.
 
 
 67
 Q. What is the function of the delivery receipt?
 
 
 68
 A. This delivery receipt is completed after the cargo is delivered to the receiver's trucker.
 
 
 69
 Q. That appears to be the delivery receipt issued for the Tia Maria that was spilled. Would that have been issued before the spill or after the spill, if you know?
 
 
 70
 A. Normally this document is issued immediately after the delivery. (R9-117).
 
 
 71
 . . . . .
 
 
 72
 Q. Can you think of a reason why there would be the release for this dock receipt signed by the parties prior to the transfer?
 
 
 73
 [objection omitted]
 
 
 74
 A. No sir, I couldn't say why. Like I say, normally this is issued after the cargo is delivered.
 
 
 75
 Q. Could it have been issued because it was anticipated that the cargo would have been pumped?
 
 
 76
 A. I would say that is the case, yes sir. (R9-118).
 
 
 77
 Thus, Naranjo, like Stephens, believed that Eller performed gravity transfers, whenever necessary, as a service to Kirk Line, and that the issuance of a delivery receipt before completion of such a transfer was contrary to normal procedures. Even assuming, as Hiram Walker contends, the evidence on this point is not uncontroverted, it is the factfinder's job to weigh the evidence and make necessary credibility determinations. The "clear error" standard of review "imposes an especially heavy burden on the appellant in a case such as this, in which the evidence was largely testimonial, and the district court had the advantage of observing the witnesses and evaluating their credibility firsthand." Lincoln v. Board of Regents of the University System of Georgia, 697 F.2d 928, 939 (11th Cir.), cert. denied, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). Nothing Hiram Walker has presented to this court comes close to satisfying its heavy burden. Having found the testimony of Stephens and Naranjo believable, the district court could easily infer that the receipt was issued inadvertently or in error. This court is not in a position to second guess that finding.
 
 
 78
 Hiram Walker is mistaken in asserting that "the [delivery receipt] itself hardly bespeaks an inadvertent error." As the district court noted, the face of the receipt does, in fact, suggest that it was issued erroneously. Handwritten across the front of the document are the words "pumped out of Tank # 24 (as per manifest)." Obviously, no such pumping occurred, and the written statement is therefore false. Moreover, the writing implies, consistent with court's finding, that the receipt is meant to confirm that cargo has been successfully transferred. On its face, therefore, the receipt indicates that it was issued prematurely, in the mistaken belief that a successful pump transfer would ensue and that no further services would be required of Eller. Because the anticipated method of delivery proved infeasible, and Eller was requested to provide additional services, the district court reasonably concluded the receipt had been issued in error and that it did not accurately reflect the point of delivery.
 
 
 79
 In its amended findings, the district court also considered it important that no gate pass was issued in this case.[3] The court found, based on the testimony of Naranjo and Stephens, that had Eller acted in accordance with its custom, a gate pass would have issued simultaneously with the delivery receipt. Thus, the court reasoned, the absence of a gate pass further demonstrates that the delivery receipt was issued prematurely.
 
 
 80
 Hiram Walker contends the district court's finding is clearly wrong because there is no evidence that gate passes and delivery receipts normally issue simultaneously. This argument, too, is unfounded. As shown above, Stephens and Naranjo both testified that when a gravity transfer is performed, the delivery receipt ordinarily issues following the transfer. Stephens added that Eller issues gate passes when it completes its terminal services and the consignee is ready to leave the facility. Although neither witness specifically stated that the documents normally issue at the same time, that can be fairly inferred since Eller's terminal services apparently end when the transfer is complete. The court's finding is therefore not clear error.
 
 
 81
 Hiram Walker also argues that the district court's emphasis on the gate pass conflicts with this court's statement in Hiram Walker II, 963 F.2d at 331, that "the absence of a gate pass ... does little to question the status of the delivery receipt as evidence, though perhaps not prima facie evidence, of delivery." That argument, however, ignores the context of the quoted statement. At the time it was made, this court was not addressing whether the delivery receipt had been issued in error--that argument had not been raised. Rather, we were merely explaining that the absence of evidence establishing change of custody, such as a gate pass, was not conclusive proof that delivery did not occur, and that the district court had therefore erred by apparently ignoring the receipt. In the context of the argument now before us, however, the absence of a gate pass may properly be viewed as limiting the probative value of the delivery receipt because it suggests that the receipt was issued prematurely. The district court's finding, therefore, does not conflict with the law of this case.
 
 
 82
 We emphasize that this ruling does not depreciate the evidentiary value of delivery receipts. Ordinarily, such a receipt would be strong evidence of delivery. We simply reject Hiram Walker's argument that the issuance of a delivery receipt conclusively proves that delivery occurred. Such an absolute rule is inappropriate in light of situations like this where the evidence strongly indicates that the receipt was mistakenly issued before completion of delivery.
 
 
 83
 Finally, contrary to Hiram Walker's argument, the district court did not ignore any longstanding practice between the parties in concluding that the gravity transfer was within the scope of Kirk Line's, and thus Eller's, duty of delivery. As noted above, the district court found that Kirk Line expected Eller to provide whatever services were needed to physically transfer the cargo to Indian River, and that it was up to Eller to decide how to accomplish that task. It found, moreover, that Eller performed gravity transfers in approximately one-third of all deliveries, and that forklifts were used at least fifteen times. These findings, all of which have previously been accepted by this court as not clearly erroneous, Hiram Walker II, 963 F.2d at 330, support the district court's conclusion that Eller was performing services for Kirk Line, and not as a volunteer, when the spill occurred.
 
 
 84
 AFFIRMED.
 
 DUBINA, Circuit Judge, concurring specially:
 
 85
 In Hiram Walker I, 877 F.2d 1508, 1516-17 (11th Cir.1989), we held that the stevedore Eller was entitled to the COGSA $500 limitation of liability up until the point at which it delivered the cargo. In Hiram Walker II, 963 F.2d 327, 331-32 (11th Cir.1992), we held that the district court erred in treating custody of the cargo as conclusive evidence of delivery and ignoring all other evidence of delivery, in particular the issuance of a delivery receipt. We remanded this case for the district court to make a factual determination of delivery based on all the evidence. On remand, the district court found that the delivery receipt had been issued erroneously and contrary to custom and thus provided no evidence of delivery. In sum, the district court found no evidence that delivery had taken place at the time of the accident.
 
 
 86
 The issues presented in this appeal are what constitutes delivery and whether delivery is a purely factual question or a mixed question of law and fact. Although the panel in Hiram Walker II treated it as a purely factual question, in the present appeal Chief Judge Tjoflat's dissent treats it as a mixed question.[1] Neither COGSA nor the agreements between the parties define delivery. The closest thing to a definition is the provision in clause 18 of bill of lading number 9 which states that "removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage ... shall be prima facie evidence of the delivery ..." Regardless of whether delivery is a legal or factual question, the district court found no evidence of delivery: custody had not been transferred; the delivery receipt was issued erroneously; and in the case of gravity feeds, delivery receipts customarily were not issued until the completion of the transfer. These factual findings are not clearly erroneous.[2] In the absence of any factual evidence of delivery, I fail to see how there could have been any delivery, either factual or legal.
 
 
 87
 While Chief Judge Tjoflat has written a compelling dissent, under the circumstances of this case, I disagree with his treatment of delivery as a legal question for several reasons. First, Hiram Walker II essentially remanded for the district court to make a factual finding on delivery. If this court were going to propound a legal definition of delivery, we should have done so in Hiram II. Second, Chief Judge Tjoflat cites no authority for his definition of delivery, which he equates with control of the cargo. Third, I disagree with Chief Judge Tjoflat's finding that Indian River controlled the cargo at the time of the accident. I agree that Indian River would have had control if it had proceeded to pump the Tia Maria into its own tank; however, since Indian River did not in fact pump the Tia Maria but rather chose to use a gravity feed transfer, it remained dependent on Eller to effectuate the transfer and thus Indian River did not have control of the cargo at the time of the accident.
 
 
 88
 For the foregoing reasons, I concur in Judge RONEY's opinion.
 
 TJOFLAT, Chief Judge, dissenting:
 
 89
 I respectfully dissent.
 
 
 90
 This case has been before the district court three times and before this court twice. See Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508 (11th Cir.1989) ("HW I"); Hiram Walker & Sons, Inc. v. Kirk Line, 963 F.2d 327 (11th Cir.1992) ("HW II"). Nevertheless, I am convinced that the main issue to be decided--when legal delivery took place--remains unresolved.[1] It is time that we resolve it.
 
 
 91
 What must be our focus is not the point of physical delivery of the liqueur, that is, when the transfer of the Tia Maria from one container to another was completed; of course, that never happened in this case.[2] Rather, this case turns on the time at which legal delivery occurred: At what point was "Kirk Line's duty ... fulfilled?" HW I, 877 F.2d at 1516; HW II, 963 F.2d at 330 n. 3.
 
 
 92
 General maritime law holds that a carrier's responsibilities include unloading the cargo onto the dock and making it accessible to the consignee. See F.J. Walker, Ltd. v. Motor Vessel "Lemoncore", 561 F.2d 1138, 1142 (5th Cir.1977).[3] And, although one searches in vain for a conclusive definition of "delivery" in the Harter Act, 46 U.S.C.App. Sec. 190 (1988),[4] delivery typically requires nothing more than "discharge of cargo upon a fit and customary wharf." Allstate Ins. Co. v. Imparca Lines, 646 F.2d 166, 168 (5th Cir. Unit B May 1981). Yet, that definition is subject to modification "according to the custom and usage of the port." Id. (quoting Walker, 561 F.2d at 1144).
 
 
 93
 In its post-trial findings of fact and conclusions of law entered after our remand in HW I, the district court made two findings of fact that are of some assistance to our understanding of "custom and usage" at the Port of Miami.[5] First, the district court concluded that, "[a]ccording to an oral agreement between Hiram Walker and Indian River, Indian River was responsible for pumping the Tia Maria cargo into its trailer." In other words, in the case of a standard, pump transfer, legal delivery took place, at the latest, at the time the two containers were aligned and Indian River was prepared to begin the pump transfer. Second, the district court noted that "Hiram Walker had no agreement with Indian River regarding how the liqueur should be transferred if it were not pumped." Thus, in the absence of a pump transfer, Hiram Walker and Indian River had not agreed contractually to a point of legal delivery. It might well be that legal delivery took place at the time the containers were aligned, just as in a pump transfer; it is equally conceivable, however, that legal delivery would have taken place only after the liqueur physically had passed from one container to a second.
 
 
 94
 Earlier, it appeared that the delivery receipt might be probative as to the point of legal delivery; now, however, it appears that the receipt may be of no use to us in resolving this contentious issue.[6]
 
 
 95
 In the absence of a probative delivery receipt, then, we must turn to indicia of control. The facts reveal that, as of the time at which Eller aligned the tank car with Indian River's truck, Indian River controlled the direction of events. Indian River's driver could have provided the device by which the Tia Maria would be pumped from the tank. Having failed to bring that device, he could have directed that Eller leave the tank car in place in order that he might obtain the necessary pumping attachment. Or, as eventually occurred, he could have directed that Eller accomplish a gravity feed. Moreover, the Indian River driver could have stopped the gravity feed at any time and, after obtaining the necessary equipment, performed a pump transfer.
 
 
 96
 Thus, through it all, Eller's actions were dictated by Indian River's driver. Control of the process by which the contents of the tank would be transferred rested with Indian River and, with it, control of the Tia Maria itself. Legal delivery had taken place.
 
 
 97
 Eller's liability is not at issue; that was settled years ago. The amount of damages also is not questioned. I, therefore, would remand to the district court with the instruction that judgment be entered on behalf of Hiram Walker and against Eller for the complete injury suffered without regard to the $500 COGSA limitation.
 
 
 
 [1]
 Clause 17 of the bill of lading, which contains the Himalaya clause, provides in pertinent part as follows:
 In the case of any loss or damage to or in connection with goods exceeding in actual value $500 lawful money of the United States per package, or, in case of goods not shipped in packages per customary freight unit the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and the Carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit or pro rata, in case of partial loss or damage....
 The limitation of liability and other provisions contained in the article shall inure not only to the agents, servants and employees, but also to the benefit of any independent contractors performing services including stevedoring in connection with the goods covered hereunder.
 
 
 [2]
 The plaintiff also argues that delivery was complete, as a matter of law, when the tank was aligned with Indian River's trailer and made available for a pump transfer. That argument, however, was rejected in Hiram Walker I, in which we held that undisputed evidence of such alignment was insufficient, in this case, to establish delivery as a matter of law:
 When a pumping transfer is effected, delivery may occur when the tank and the trailer are aligned--but it does not necessarily follow that delivery in the case of a gravity feed can finally occur before the last of the liquid is drained into the trailer; the scope of Kirk Line's duty under the bill of lading may thus depend upon the type of transfer that actually is performed. The district court should determine after trial whether Kirk Line's obligations had completely terminated by the time of the spill....
 877 F.2d at 1517.
 
 
 [3]
 This court has already accepted as not clearly erroneous the district court's finding that "[n]o gate pass was issued." Hiram Walker II, 963 F.2d at 330
 
 
 [1]
 While I agree with the dissent that the question of delivery can be a mixed question--that is, depending on the circumstances of a given case, delivery can be purely factual or purely legal--here, given the sparse factual evidence of delivery, I cannot see how legal delivery could have taken place under any common sense notion of delivery
 
 
 [2]
 The Seventh Circuit's definition of clearly erroneous is the best I have seen: "To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must, as one member of the court recently stated during oral argument, strike us as wrong with the force of a five-week old, unrefrigerated dead fish." Parts and Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir.1988)
 
 
 [1]
 I believe the issue we must examine on appeal (when legal delivery took place) to be broader than that presented in the majority opinion (whether the district court was clearly erroneous in finding that the delivery receipt was issued inadvertently). See Ante maj. opinion at 1374. Accordingly, I believe our standard of review to be de novo as the determination of legal delivery is a question of law (or, at the least, a mixed question of law and fact), not a question of fact subject to a clearly erroneous standard
 
 
 [2]
 The district court's amended findings of fact and conclusions of law, entered after our remand in HW II, belie its continued treatment of change of custody and legal delivery as interchangeable: "As long as the Tia Maria remained in Tank # 24, it had not been delivered to Hiram Walker's agent, Indian River." Amended Conclusion of Law No. 8. It is the district court's mistaken equivalence of these concepts that mandates appellate de novo review
 
 
 [3]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent decisions of the former Fifth Circuit handed down prior to October 1, 1981
 
 
 [4]
 The Harter Act defines the duty of care from the time goods are discharged from the ship until they are delivered to the consignee. See Allstate Ins. Co. v. Imparca Lines, 646 F.2d 166, 168 (5th Cir. Unit B May 1981)
 
 
 [5]
 We have accepted the findings of fact in the district court's first opinion on remand as not clearly erroneous. HW II, 963 F.2d at 330
 
 
 [6]
 Delivery receipts, the district court correctly concluded, typically were issued only after physical delivery, regardless of the means of transfer (pump or gravity). Thus, in the case of a pump transfer, although physical delivery of the liqueur and the issuance of the delivery receipt were closely conjoined, there was no nexus between the legal delivery of the Tia Maria and issuance of the delivery receipt. Eller has not demonstrated--and the district court has not found--that the delivery receipt is of any greater probative value in determining the point of legal delivery for gravity transfers either