[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 99-14643

_____
D. C. Docket No. 96-08341-CV-KLR

FIREMAN'S FUND INSURANCE COMPANY,
TALL PONY PRODUCTIONS, INC.,

Plaintiffs-Appellants,

IN ANY EVENT, INC.,

Plaintiff,

versus

TROPICAL SHIPPING AND CONSTRUCTION
COMPANY, LTD., BIRDSALL, INC.,

Defendants-Appellees,

STAGELINE MOBILE STATE, INC.,

Defendants-Cross-
Defendants,

M/V TROPIC TIDE, in rem,
SEVEN SEAS INSURANCE CO., INC.,

Defendants,

BROMMA, INC.,

Defendant-Cross-
Claimant.

No. 00-10131

D. C. Docket Nos. 96-08341-CV-KLR
& 96-08876-CV-KLR

FIREMANMAN'S FUND INSURANCE COMPANY,
IN ANY EVENT, INC.,

Plaintiff-Appellee,

TALL PONY PRODUCTIONS, INC.,

Plaintiff-Appellee-
Cross-Appellant,

versus

TROPICAL SHIPPING AND CONSTRUCTION COMPANY, LTD.,
BIRDSALL, INC.,

Defendants-Cross-
Defendants,

BROMMA, INC.,

Defendant-Cross-
Claimant,

M/V/ TROPIC TIDE, In Rem,
STAGELINE MOBILE STAGE, INC.,

Defendants,

SEVEN SEAS INSURANCE COMPANY, INC.,

Defendant-Appellant-
Cross-Appellee.

--------------------------------------------------------------------------------------------------
--
TALL PONY PRODUCTIONS, INC.,

Plaintiff-Appellee-

2

Cross-Appellant,

versus

SEVEN SEAS INSURANCE CO., INC.,

Defendant-Appellant-
Cross-Appellee.

_____

No. 00-11678
_____

D. C. Docket Nos. 96-08341-CV-KLR
& 96-08876-CV-KLR

FIREMAN'S FUND INSURANCE COMPANY,
IN ANY EVENT, INC.,
TALL PONY PRODUCTIONS, INC.,

Plaintiffs-Appellees,

versus

TROPICAL SHIPPING AND CONSTRUCTION
COMPANY, LTD., BIRDSALL, INC.,

Defendants-Cross-
Defendants,

BROMMA, INC.,

Defendant-Cross-
Claimant,

STAGELINE MOBILE STATE, INC.,
M/V TROPIC TIDE, in rem,

Defendant,

SEVEN SEAS INSURANCE CO., INC.,

Defendant-Appellant.

_____

No. 00-12336

_____

D. C. Docket No. 96-08341-CV-KLR

FIREMAN'S FUND INSURANCE COMPANY,
IN ANY EVENT, INC.,
TALL PONY PRODUCTIONS, INC.,

Plaintiffs-Appellees,

versus

TROPICAL SHIPPING AND CONSTRUCTION COMPANY, LTD.,

Defendant-Cross-
Defendant-Appellant,

BROMMA, INC.,

Defendant-Cross-
Claimant,

BIRDSALL, INC.,

Defendant-Cross-
Defendant,

M/V TROPIC TIDE, in rem,
SEVEN SEAS INSURANCE CO., INC.,

Defendants,

STAGELINE MOBILE STAGE, INC.,

Cross-Defendant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

Before TJOFLAT, DUBINA and MESKILL[*], Circuit Judges.

MESKILL, Circuit Judge:

This action spawned four appeals from various final judgments entered by the United States District Court for the Southern District of Florida, Ryskamp, J., brought by two insurance companies, an ocean carrier and its stevedore, and a television production company, arising out of the destruction of a mobile stage while it was being loaded for transport from the Port of Palm Beach to the island of St. Maarten for use in an HBO television special titled "Sinbad's 70's Soul Party."

## BACKGROUND

A. Facts

In May 1995, Tall Pony Productions (Tall Pony) leased a mobile stage from In Any Event, Inc. (Any Event). Any Event had previously leased the stage from its owner, Stageline Mobile Stage (Stageline), a Canadian manufacturer of mobile stages. Tall Pony subleased the stage in connection with an HBO Sinbad Special television production scheduled to take place in St. Maarten. Tall Pony contracted with Tropical Shipping & Construction (Tropical), an ocean carrier, to transport the stage and other equipment from the Port of Palm Beach to St. Maarten. Tropical and Tall Pony entered into a shipping contract, evidenced by a bill of lading, for shipment of the cargo on Tropical's vessel, the "Tropic Tide."

---

[*]    Honorable Thomas J. Meskill, U.S. Circuit Judge for the Second Circuit, sitting by designation.

A separate clause in the bill of lading limited Tropical's liability to $500 for each trailer or container prepared by the shipper, except where the shipper, in this case Tall Pony, declared a higher value for the equipment and paid the corresponding higher ad valorem tariff. Tropical contends that Tall Pony did not declare value for the shipment on the bill of lading, and, as such, did not pay a higher tariff rate for its cargo, which the district court noted would have been approximately $64,000 based on figures provided by Tropical. If Tropical is correct, Tall Pony's recovery for property damage to the stage is limited to the $500 per package limitation provided under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. App. § 1304(5).

Fireman's Fund insured both Tall Pony and Any Event. To that end, Fireman's Fund issued Tall Pony a "blanket policy," which was supplemented with separate declaration endorsements for each production undertaken by Tall Pony. Fireman's Fund issued one such policy and declaration for the "Sinbad's 70's Soul Party" production. That policy states, in pertinent part, that "[t]his coverage insures against all risks of direct physical loss or damage to the property covered." The policy further provides coverage for "the value of personal property, including but not limited to . . . mechanical effects equipment, grip equipment and mobile equipment . . . damaged or destroyed during the term of coverage, caused by the Perils Insured against, while such property is used or to be used by you in connection with an insured production." Notably, the policy does not contain an exclusion for property damage incurred during the loading and transport of the stage, and no endorsement to that effect was ever issued by

6

Fireman's Fund in connection with the Tall Pony production at issue. The Fireman's Fund policy also contains an "Other Insurance" provision, which provides that the policy "shall apply as excess insurance over [any] other insurance" issued in favor of Tall Pony and covering the same property.

Fireman's Fund issued a Certificate of Insurance on behalf of Tall Pony and in favor of Stageline for the mobile stage. As the lessee of the stage, Any Event was required to indemnify Stageline for damage to the stage. Tall Pony, the sublessee and actual user of the stage, was in turn legally obligated to indemnify Any Event for any amounts it paid to Stageline arising from damage to the stage.

Shortly before the scheduled shipment date, Jerome Anderson, the Fireman's Fund underwriter for the Tall Pony policy, informed Tall Pony that its policy did not cover the loading and ocean transport of the stage and that Fireman's Fund did not wish to underwrite risks associated with shipping by water. Concerned about lack of coverage for the stage once it was turned over to Tropical for loading onto its vessel, Danny Harris, head of production at Tall Pony, contacted Tropical to inquire about obtaining ocean marine cargo coverage for the shipment. Tropical referred Harris to Jim McIntire, a vice-president at Seven Seas Insurance Company (Seven Seas), a sister corporation of Tropical. After independently checking on Seven Seas with its broker, Tall Pony obtained "open cargo" or "open sea" insurance coverage from Seven Seas for the ocean transport of the stage, listing Tall Pony as named assured. The Seven Seas policy was an "all risk" cargo policy, and contained an "Other Insurance"

provision similar to the one contained in the Fireman's Fund policy. At Tall Pony's request, on May 17, 1995, the same day the stage was damaged, Seven Seas issued a letter to Tall Pony, confirming that the stage was insured for ocean transport under the Seven Seas policy: "Tall Pony Productions is held covered on their cargo sailing from Port of Palm Beach to St. Maarten and on the return trip from St. Maarten to Port of Palm Beach. Coverage is all risk excluding any pre-existing discrepancies prior to receipt from Tropical Shipping." Relying on Seven Seas' letter as proof of insurance coverage for its shipment, Tall Pony took no further action with respect to securing insurance coverage.

Tropical employed Birdsall, a stevedore, to load the stage onto the vessel through the use of a crane with spreaders. The crane employed by Birdsall was manufactured by Bromma. During the course of loading the stage, the crane failed, causing the stage to drop to the dock, resulting in its total destruction. Consistent with the adage that "the show must go on," Tall Pony made arrangements to secure a replacement stage.

B. Proceedings in the District Court

On May 17, 1996, Tall Pony, Fireman's Fund, its insurer, and Any Event commenced an action against Tropical, Birdsall, Bromma and Stageline, and the Tropic Tide, in rem, for damages arising from the destruction of the stage at the time it was being loaded onto the Tropic Tide (Tall Pony I). On December 19, 1996, Tall Pony initiated a separate action against Seven Seas to recover, inter alia, property and consequential damages pursuant to the terms of the "all risk" policy issued by Seven Seas (Tall Pony II). On May 1, 1997, the district court

8

dismissed, on joint stipulation of the parties, Any Event as a plaintiff in Tall Pony I. On November 7, 1997, the district court consolidated the Tall Pony I and Tall Pony II actions.

While Tall Pony I and Tall Pony II were pending in the district court, Stageline and its insurers commenced an action against Fireman's Fund and Any Event to recover for the property damage to the stage. In settlement of that claim, Fireman's Fund paid Stageline and its insurers $234,000. On December 2, 1997, in exchange for payment of the settlement proceeds, Stageline and its insurers executed a release in favor of Fireman's Fund and/or its insureds for all claims relating to the physical damage to the stage. Fireman's Fund made additional payments for claims arising out of the destruction of the stage: $57,500 to Any Event for its loss of use claim against Tall Pony; $180,348 to Tall Pony for reimbursement of expenses incurred in connection with obtaining a replacement stage; and $2,175 for miscellaneous accounting expenses.

In October 1998, some ten months after Fireman's Fund settled the claims brought by Stageline and its insurers, Tall Pony signed a loan receipt in favor of Fireman's Fund for $474,023, the total amount of funds paid out by Fireman's Fund for claims arising out of the destruction of the stage. The loan receipt was principally comprised of three separate sets of payments made by Fireman's Fund: the settlement funds Fireman's Fund paid to Stageline and its insurers; payment to Any Event on its loss of use claims against Tall Pony; and payment to Tall Pony directly for costs incurred in securing a replacement stage, i.e., consequential damages. The loan receipt provided, inter alia, that the $474,023

9

was a loan and not payment on any claim, and was repayable out of any net recovery Tall Pony made against any vessel, carrier or insurance company for property damage to the stage.

In a decision dated August 25, 1997, the district court held that the mobile stage constituted a single "package" for purposes of COGSA and, thus, Tropical and Birdsall's liability to Fireman's Fund and Tall Pony for the damage to the stage was limited to $500, the statutory per package limitation on a carrier's liability under COGSA. See 46 U.S.C. App. § 1304(5). In concluding that the $500 COGSA limitation applied, the district court determined that Tall Pony was on constructive notice of the contents of the bill of lading, which contained a "clause paramount" that expressly adopted the provisions of COGSA, see Ins. Co. of N. Am. v. M/V Ocean Lynx, 901 F.2d 934, 939 (11th Cir. 1990), and that Tall Pony failed to declare a higher value -- and, therefore, pay a higher tariff rate -- for its cargo in order to opt out of the COGSA limitation. In reaching its decision, the district court found that the bill of lading legibly and clearly described the stage as "one unit" or "package" for purposes of COGSA. The district court further held that Birdsall's liability was limited to $500 pursuant to the "Himalaya Clause" contained in the bill of lading.[1] On appeal, Fireman's Fund and Tall Pony argue that the district court erred in holding that Tropical and Birdsall had limited liability under section 1304(5).

On February 16-18, 1999, the district court held a bench trial on the issue

---

[1] A "Himalaya Clause" is an express provision in the bill of lading that extends the COGSA defenses and protections to the carrier's agents and contractors. See Hale Container Line v. Houston Sea Packing Co., 137 F.3d 1455, 1465 (11th Cir. 1998).

10

of liability as to Tropical, Birdsall and the other defendants in connection with the destruction of the stage. Following that trial, the district court held that Birdsall was negligent in lifting the stage, and that its negligence was the proximate cause of the damage to the stage. The district court further held that Tropical was vicariously liable to Tall Pony and Fireman's Fund for the damage to the stage. The district court held Tropical and Birdsall jointly and severally liable for the damage to the stage. However, based on the district court's prior ruling, Tropical's and Birdsall's liability to Tall Pony and Fireman's Fund was limited to $500 under COGSA section 1304(5) and the "Himalaya Clause" contained in the bill of lading. The district court also dismissed with prejudice the claims asserted by Tall Pony and Fireman's Fund against Stageline and Bromma. The district court entered final judgment on the issue of liability on June 7, 1999. Stageline and Bromma are not parties to the instant appeals.

On October 12-13, 1999, the district court held a bench trial on Tall Pony's claim against Seven Seas for damages and attorney's fees under the ocean cargo policy issued by Seven Seas as the liability insurer of Tropical, and on Tall Pony's failure to procure insurance claim against Tropical. On October 13, 1999, the district court orally issued its findings of fact and conclusions of law with respect to Tall Pony's claims. The district court held that Seven Seas had assumed sole coverage for ocean transport of the stage by Tropical and, accordingly, was liable to Tall Pony for $234,000, the amount paid by Fireman's Fund on behalf of Tall Pony in settlement of the claims brought by Stageline and its insurers. The district court held that Tall Pony could not, however, recover

11

consequential damages from Seven Seas related to the cost of obtaining a replacement stage and the interruption of its business. Although the district court held that Tall Pony was entitled to attorney's fees pursuant to Fla. Stat. § 627.428, it did not make a specific fee award at that time. Finally, the district court held that Tropical was not liable on Tall Pony's failure to procure insurance claim. Final judgment to that effect was entered on October 14, 1999, and an amended final judgment was entered on December 9, 1999. On March 6, 2000, the district court entered judgment awarding attorney's fees of $76,912.50, plus interest, in favor of Tall Pony and against Seven Seas.

On appeal, Seven Seas challenges the district court's finding that it alone is liable to Tall Pony for the amounts paid by Fireman's Fund on behalf of Tall Pony to Stageline and its insurers for the property damage to the stage. Tall Pony cross-appeals, contesting the district court's decision limiting its recovery against Seven Seas to $234,000. Tall Pony also seeks attorney's fees in connection with the instant appeal pursuant to Fla. Stat. § 59.46.

Following the district court's decision, Tropical filed a motion to tax costs pursuant to Fed. R. Civ. P. 54(d) with respect to the dismissal of Tall Pony's failure to procure insurance claim. The district court initially granted Tropical's motion, but later vacated that award after Tall Pony moved for reconsideration. On appeal, Tropical argues that its award of costs should be reinstated.

DISCUSSION

We first consider whether the district court erred in holding that section 1304(5) of COGSA limits Tropical's and Birdsall's liability for the physical

12

damage to the stage to $500.

A. Tall Pony v. Tropical

    1. Limited Liability Under COGSA

We review de novo the district court's interpretation and application of the provisions of COGSA and its factual findings for clear error. See All Underwriters v. Weisberg, 222 F.3d 1309, 1310 (11th Cir.) ("This court reviews a district court's application of admiralty law de novo."), cert. dismissed, 121 S.Ct. 674 (2000); Marine Transp. Servs. Sea-Barge Group v. Python High Performance Marine Corp., 16 F.3d 1133, 1138 (11th Cir. 1994) (Sea Barge) (citing M/V Ocean Lynx, 901 F.2d at 939).

The parties do not dispute that COGSA, which governs "all contracts for carriage of goods by sea to or from ports of the United States in foreign trade," Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co., 215 F.3d 1217, 1220 (11th Cir. 2000) (quoting 46 U.S.C. App. § 1312), applies to Fireman's Fund's and Tall Pony's claims against Tropical and Birdsall for the property damage to the stage. The parties differ, however, on the application of section 1304(5) to the instant dispute. Fireman's Fund and Tall Pony argue that, because the stage is an unpackaged piece of machinery, the $500 COGSA limitation should be multiplied by each "customary freight unit," which they contend is cubic feet. See Hayes-Leger Assocs. v. M/V Oriental Knight, 765 F.2d 1076, 1081 n.10 (11th Cir. 1985) (Hayes-Leger) (holding that the "customary freight unit" determination "is a question of fact that varies from contract to contract"). Thus, Fireman's Fund and Tall Pony contend that the maximum recovery they are

13

entitled to under section 1304(5) is $500 multiplied by 5,304 cubic feet (the total size of the stage), or $2,652,000, which far exceeds the $474,023 they sought. In response, Tropical and Birdsall argue that the bill of lading listed the stage as a single item or unit and, accordingly, the stage constituted one "package" for purposes of COGSA. Thus, under Tropical's and Birdsall's theory, Tall Pony's recovery for the damage to the stage should be limited to $500. We conclude that the district court properly applied section 4(5) of COGSA, 46 U.S.C. App. § 1304(5), when it concluded that the mobile stage trailer qualified as one "package," such that Tropical and Birdsall's liability for damage to the stage should be limited to $500.

Section 4(5) of COGSA provides, in pertinent part:

> Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . , or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.

46 U.S.C. App. § 1304(5); see also M/V Ocean Lynx, 901 F.2d at 939 ("Congress enacted the COGSA limitation on liability . . . in order to restrain the superior bargaining power wielded by carriers over shippers by setting a reasonable limitation on liability that the carriers could not reduce by contract."). The bill of lading executed by Tall Pony and Tropical extended the applicability of COGSA -- which included, inter alia, the limitation of liability clause contained in section 1304(5)-- "from the time when the goods are received by the

14

Carrier . . . at the port of loading until they are delivered or dispatched by the Carrier . . . at the port of discharge." Bill of Lading at ¶ 3; see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 557 (2d Cir. 2000) ("A carrier and a shipper can extend COGSA so that it applies prior to loading and subsequent to discharge of goods from a ship, but the extent of any application beyond the scope of the statute is a matter of contract.") (citing 46 U.S.C. App. § 1307) (footnote omitted).

To invoke the limitation on liability under section 1304(5), the carrier must satisfy two preconditions: "First, the carrier must give the shipper adequate notice of the $500 limitation by including a `clause paramount' in the bill of lading that expressly adopts the provisions of COGSA. Second, the carrier must give the shipper a fair opportunity to avoid COGSA section 4(5)'s limitation by declaring excess value." M/V Ocean Lynx, 901 F.2d at 939 (internal citations omitted); see also 46 U.S.C. App. § 1312. After reviewing the bill of lading, the district court concluded that Tropical satisfied both preconditions. We agree.

Paragraph two of the bill of lading is entitled "Clause Paramount," and provides that the bill of lading is subject to the provisions of COGSA and that the carrier is entitled "to any privilege and right and immunity provided [under COGSA]." Bill of Lading at ¶ 2. The clause paramount put Tall Pony on constructive notice that it could declare a higher value for its cargo on the bill of lading. See, e.g., M/V Ocean Lynx, 901 F.2d at 939 (holding that a clause paramount in the bill of lading "is sufficient to afford the shipper an opportunity to declare excess value"). Tracking the language in section 1304(5), the bill of

15

lading also put Tall Pony on actual notice that it could opt out of the COGSA

liability limitation by declaring a higher value for the shipment and paying an

extra freight charge:

> [T]he value of the goods shall be deemed to be $500.00 per package . . . unless the nature of the goods in a valuation higher than $500.00 shall have been declared in writing by the Shipper upon delivery to the Carrier and inserted in this Bill of Lading and extra freight paid if required . . . .
>
> . . . .
>
> Where container(s) or trailer(s) [are] stuffed by shipper or on his behalf, Carrier's liability shall be limited to $500.00 with respect to the contents of each container or trailer, except when the Shipper declares ad valorem valuation on the face hereof and pays additional freight on such declared valuation.

Bill of Lading at ¶ 12; see also Sea-Barge, 16 F.3d at 1141 (holding that, to

avoid the $500 COGSA limitation on liability, the shipper "must declare the

value of its cargo on the face of the bill of lading" and "pay additional freight on

the cargo, as required by the applicable tariff to obtain the benefit of such higher

valuation") (internal quotation marks omitted). The bill of lading extended the

limitation on liability to Birdsall, which functioned as the stevedore during the

loading of Tall Pony's shipment. See Bill of Lading at ¶¶ 4 (Himalaya Clause)

and 12. We conclude that the district court did not commit clear error when it

found that the bill of lading was not illegible as a matter of law. Accordingly,

we conclude that the bill of lading provided Tall Pony sufficient notice of the

limitation of liability under section 1304(5), and an opportunity to declare a

higher value for its cargo (and, thus, pay a higher freight charge) in order to

avoid COGSA's limitation for loss or damage resulting from the actions of the

16

carrier or its servants and agents.

We must next determine whether the district court properly applied the COGSA definition of "package" to the equipment shipped.

This Circuit has adopted the Second Circuit's definition of "package" under COGSA. See Fishman & Tobin v. Tropical Shipping & Constr. Co., Ltd., 240 F.3d 956, 960 (11th Cir. 2001) (Fishman); Hayes-Leger, 765 F.2d at 1082. In Fishman, we recently reaffirmed our adherence to the definition of "package" set forth by the Second Circuit in Aluminios Pozuelo, Ltd. v. S.S. Navigator, 407 F.2d 152 (2d Cir. 1968) (Aluminios): "The meaning of `package' . . . can therefore be said to define a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods." Id. at 155.

At the outset, we note that our resolution of disputes arising out of the $500 per package limitation on carrier liability is complicated by the absence of statutory language "defining the meaning and scope of the word `package,'" and "the adoption of new methods of preparing and assembling goods for shipment." Binladen BSB Landscaping v. M.V. "Nedlloyd Rotterdam", 759 F.2d 1006, 1011-12 (2d Cir. 1985) (Binladen) (citing Allied Int'l Am. Eagle Trading Corp. v. S.S. "Yang Ming", 672 F.2d 1055, 1064 (2d Cir. 1982)). Accordingly, in construing the parameters of the COGSA limitation on liability provision, courts are called on to "evaluate diverse and occasionally idiosyncratic items shipped in various forms -- bundles, boxes, cartons, bales, coils, crates, rolls, skids, pallets,

17

and containers -- in order to determine what units, if any, constitute COGSA `packages.'" Id. at 1012. Our analysis is further complicated by advancements in technology, such as those present in the design of the stage, that outpace the existing law under COGSA. Here, for instance, we must decide whether a "fully mobile, preassembled, hydraulically operated staging unit" constitutes a "package" under COGSA.

Notwithstanding, several basic principles guide our determination of whether the mobile stage constitutes a single "package" under COGSA. For carriers to avoid unforeseen liability, "the number of packages should be fully and accurately disclosed and easily discernable by the carrier." Fishman, 240 F.3d at 961. "As a result, the touchstone of our analysis is the contractual agreement between the parties as set forth in the bill of lading." Id. (internal quotations omitted); see also Hale Container Line v. Houston Sea Packing Co., 137 F.3d 1455, 1469 (11th Cir. 1998) (characterizing the bill of lading as "the contract of carriage"); Hayes-Leger, 765 F.2d at 1080 (quoting Binladen, 759 F.2d at 1012). "Entries on the bill of lading are thus important evidence of the intent of the parties to the shipping contract, and the declaration on the bill may bind a shipper even when the contents of the shipment diverge from the description on the bill." Binladen, 759 F.2d at 1012 (internal citations omitted). We have taken great pains to note, however, that reference to the $500 COGSA liability limitation in the bill of lading "shall be prima facie evidence, but shall not be conclusive on the carrier." Hiram Walker & Sons v. Kirk Line, 963 F.2d 327, 331 n.5 (11th Cir. 1992) (quoting 46 U.S.C. App. § 1304(5)). While "an

18

ambiguity on a bill of lading regarding the number of COGSA packages should be resolved in favor of the shipper," Sony Magnetic Prods. v. Merivienti O/Y, 863 F.2d 1537, 1542 (11th Cir. 1989), in construing the terms of the bill of lading, like any other contract, "[t]he court cannot make a new contract for the parties where they themselves have employed express and unambiguous words." Int'l Ins. Co. v. Johns, 874 F.2d 1447, 1454 (11th Cir. 1989).

We begin with the district court's description of the mobile stage, unchallenged by the parties on appeal, which we accept as not clearly erroneous, see Hiram Walker & Sons, 963 F.2d at 330:

> The mobile stage in question is not a shipping container per se. When the stage is folded up, it can be pulled by a diesel tractor on the highways as if it were a regular tractor-trailer rig. When the stage is folded down, the walls of the trailer form the floor of the stage, and internal aluminum superstructures fold up to form metal rigging for attaching lights, roofing and windwalls. The manufacturer's promotional materials claims [sic] that "Stageline has not reinvented the wheel, it's reinvented the stage on wheels!"

In the bill of lading, the parties listed the mobile stage trailer as one unit. This designation, along with the terms of the bill of lading incorporating the provisions of COGSA and expressly invoking the $500 per package limitation on liability under COGSA for loss or damage to the shipment, is "important evidence of the intent of the parties to the shipping contract." Binladen, 759 F.2d at 1012. Thus, absent ambiguity in the description of the number of packages on the bill of lading, "parties to bills of lading should expect to be held to the number that appears under a column whose heading so unmistakably refers to the number of packages." Seguros "Illimani" S.A. v. M/V Popi P, 929 F.2d 89, 94 (2d Cir. 1991) (Seguros "Illimani"); see also Fishman, 240 F.3d at 964 (holding

19

that courts should look beyond the "number of packages" column in the bill of lading in cases where the description of the shipment in the bill of lading is ambiguous or where the carrier's description of the shipment is "self-serving"). In Fishman, we cited with approval to the Second Circuit's decision in Seguros "Illimani", which held, in pertinent part:

> The number appearing under the heading "NO. OF PKGS." is our starting point for determining the number of packages for purposes of the COGSA per-package limitation, and unless the significance of that number is plainly contradicted by contrary evidence of the parties' intent, or unless the number refers to items that cannot qualify as "packages," it is also the ending point of our inquiry.

929 F.2d at 94 (emphasis added); see also Hayes-Leger, 765 F.2d at 1081 (shipper not entitled to recover full damages where "the bill of lading listed `ONE CONTAINER ONLY' as the number of packages"); Aluminios, 407 F.2d at 156 ("Having specified that the press was `ONE (1)' package, they must abide by its meaning as a word of liability limitation."). Further, courts have held similarly large items to constitute a single unit or package for purposes of COGSA. See, e.g., FMC Corp. v. S.S. Marjorie Lykes, 851 F.2d 78 (2d Cir. 1988) (fire engine); Aluminios, 407 F.2d at 156 (three-ton press); Z.K. Marine, Inc. v. M/V Archigetis, 776 F.Supp. 1549, 1554-55 (S.D. Fla. 1991) (yacht); Taiwan Power Co. v. M/V George Wythe, 575 F.Supp. 422, 423-24 (N.D. Fla. 1983) (pressurizer weighing approximately 155,000 pounds, placed on three wooden saddles and secured by means of steel straps).

Tall Pony argues that because the stage's design does not require packaging for it to be transported by the ocean carrier, the stage cannot be classified as a "package" for purposes of section 1304(5). We disagree.

We will not permit Tall Pony to hide behind the sophisticated technology and design of the stage to avoid the unambiguous terms of the bill of lading and the description of the stage as one unit in the bill of lading. The stage was "prepared for shipment in the normal manner in which goods of this kind are prepared," Hayes-Leger, 765 F.2d at 1082 (quotation marks omitted), and no further packaging was required or could have been undertaken in order to ready the stage for ocean transport. As the district court stated, "[t]he sheer cleverness of the design obviates any need to prepare the stage in any way for shipping other than by folding it up." Danny Harris, the head of production at Tall Pony, testified at deposition that the stage was "[s]elf-contained:" "[y]ou push two buttons and it opens up out of a giant tractor trailer and becomes a giant stage, with . . . little help from its technicians." Thus, the packaging of the stage is effectively incorporated into the design of the stage, which becomes one "package" enclosed on all sides when it is folded up. Under these circumstances, it would be unfair to permit Tall Pony to rely on the state-of-the-art technology of the stage as a means of avoiding the $500 per package COGSA limitation on liability and the express language in the bill of lading, and thereby expose carriers like Tropical to unforeseen liability. See Fishman, 240 F.3d at 961.

Because we conclude that the mobile stage trailer constitutes a single "package" for purposes of COGSA, we reject Tall Pony's argument that the district court should have applied the $500 COGSA limitation on damages based on the cubic area of the stage, which Tall Pony contends was the "customary freight unit" used by Tropical in calculating the freight charge for the stage. In

21

Aluminios, the Second Circuit rejected this argument under similar circumstances:

> [T]here is nothing in the Bill of Lading or in the statute that justifies the assumption that [a cubic foot] constitute[s] a "customary freight unit." The parties could select this method for fixing the freight charges but there was no proof that such a cubic area was a "customary" unit to each of which units the $500 limitation was applicable. It would be highly artificial to attribute to the [stage] as would [Tall Pony], . . . $500 to each [cubic foot] or a ceiling on liability of [$2,652,000] in order to cover the [$474,023] loss.

407 F.2d at 156.

Tall Pony next argues that it is entitled to recover the full value of the stage because it satisfied the requirements in the bill of lading by declaring a higher value for the stage on the bill of lading. In response, Tropical and Birdsall contend that the amount listed in the bill of lading represents the insurable value of the stage for purposes of obtaining insurance coverage, and was not the declared value of the stage, which would have required Tall Pony to pay a significantly higher ad valorem freight charge pursuant to applicable tariff regulations. We conclude that Tall Pony did not declare the value of the stage on the bill of lading and, accordingly, is limited to the $500 recovery provided under section 1304(5).

A shipper can increase the carrier's potential liability for loss or damage to the shipper's cargo "simply by declaring a higher value and ensuring that it is inserted in the bill of lading." Stolt Tank Containers v. Evergreen Marine Corp., 962 F.2d 276, 279 (2d Cir. 1992) (quotation marks omitted). If the shipper chooses this option, it must pay additional freight on the cargo "in accord with filed ad valorem rates." Sea-Barge, 16 F.3d at 1141; see also Fishman, 240 F.3d

22

at 962 n.7 ("[I]f [the shipper] wanted greater insurance coverage on its clothing, it could have paid additional freight charges, thus opting out of COGSA coverage."); Stolt Tank Containers, 962 F.2d at 279. "The shipper must declare the value of its cargo on the face of the bill of lading, not on some other related documents, to satisfy the valuation requirement." Sea-Barge, 16 F.3d at 1141. As the shipper, it was Tall Pony's responsibility to ensure that the declared value was properly documented on the bill of lading.[2] See Hale Container Line, 137 F.3d at 1469 ("Under COGSA, the shipper has the burden of declaring the value of its goods and paying a higher freight if it wants to have greater liability placed on the carrier.") (footnotes omitted).

In arguing that it is entitled to the full value for the stage, Tall Pony fails to distinguish between the insurable and declared value of the stage. See, e.g., Sea Barge, 16 F.3d at 1141 (holding that the $100,000 figure appearing on the bill of lading "was the amount of insurance coverage . . . sought -- not a declaration of value for the purpose of satisfying the valuation requirement").

_____

[2] Interestingly, in arguing that it did not accept the bill of lading, and would not have done so in the present case, see, e.g., Belize Trading, Ltd. v. Sun Ins. Co., 993 F.2d 790, 792 (11th Cir. 1993) (holding that descriptions of the cargo in the bill of the lading were not controlling since "the descriptions were merely the carrier's unilateral and self-serving statements of the shippers' cargos"), Tall Pony does not challenge the bill of lading's description of the stage as one unit, which is prima facie evidence of the parties' intention to treat the stage as a single package for purposes of COGSA. See 46 U.S.C. App. § 1304(5). Instead, Tall Pony rests its argument on the very different ground that the bill of lading would not have been accepted because it failed to contain the declared value for the stage. This argument is insufficient to preclude application of COGSA in the present circumstances. See, e.g., Itel Container Corp. v. M/V "Titan Scan", 139 F.3d 1450, 1453 (11th Cir. 1998) ("[T]he parties' intent to apply the higher limit must be clear; if the question of whether the parties agreed to a higher liability limit is `irretrievably ambiguous,' then U.S. COGSA applies by default."). The weakness in this argument is based on Tall Pony's confusion over a cargo's "declared" value and its "insurable" value. This confusion is apparent in Tall Pony's assertion on appeal that "[t]he bill of lading in any event would not have been accepted[] because it did not contain the insured value" (emphasis added).

23

Simply stated, the insurable value is relevant with respect to the amount of premium paid to the <u>insurer</u> for coverage of a particular shipment. In contrast, the declared value is relevant in calculating the higher tariff rate paid to the <u>carrier</u> in order for the shipper to opt out of the COGSA $500 limitation on liability. Thus, the amount of insurance coverage sought by a shipper is not equivalent to a declaration of value for the shipment sufficient to satisfy the valuation and tariff requirements. Tall Pony's confusion is evident in its brief on appeal where it argues that Tropical cannot limit its liability because "Tall Pony <u>declared</u> the value of the shipment and agreed to pay $9,721.51 to <u>insure</u> the cargo" (emphasis added). As such, we agree with the district court's conclusion that Tall Pony failed to declare the value of the stage on the bill of lading.

Moreover, it is undisputed that Tall Pony failed to pay additional freight on the cargo based on the applicable <u>ad valorem</u> tariff rates. An addendum to the bill of lading provided that "[a]dditional liability will only be assumed by Carrier at the request of the shipper and upon payment of an additional charge of two and one-half (2½%) percent of the total declared valuation." The district court determined that Tall Pony would have been required to pay an additional <u>ad valorem</u> freight tariff of approximately $64,000 based on a <u>declared</u> value of $2,547,505 for the shipment. We concur in the district court's calculation.[3] Instead, Tall Pony opted to rely on its insurance policy with Seven Seas to insure its cargo. <u>See</u>, <u>e.g.</u>, <u>M/V Ocean Lynx</u>, 901 F.2d at 940. If Tall Pony believed that it had declared the higher value for the cargo, it would not have needed to

---

[3]     $2,547,505 times .025 results in an additional tariff charge of $63,688 for the shipper.

obtain the Seven Seas policy. By making the business decision in favor of insurance coverage, Tall Pony actually paid an insurance premium of $9,807.40 (as listed in the bill of lading), an amount significantly less than the $64,000 ad valorem tariff it would have been required to pay had it declared the value of the shipment on the bill of lading. Under these circumstances, we will not provide Tall Pony "the benefit of insurance for which it did not pay." Unimac Co. v. C.F. Ocean Serv., 43 F.3d 1434, 1438 n.7 (11th Cir. 1995). For these reasons, we hold that the district court properly concluded that Tall Pony's claim against Tropical and Birdsall for damage to the stage was limited to $500 under section 1304(5).

2. Failure to Procure Insurance Claim

Tall Pony also appeals the district court's dismissal of its failure to procure insurance claim against Tropical.

Tall Pony brought a claim against Tropical for negligently failing to procure the proper insurance coverage on its cargo for that portion of Tall Pony's property and consequential damages resulting from the destruction of the stage that are not recoverable under the Seven Seas policy. In the event that it cannot recover on its failure to procure insurance claim, Tall Pony raises an alternative theory of recovery under Restatement (Second) Torts § 323, which provides liability for negligence in a voluntary, rather than a contractual, undertaking. See, e.g., DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 201-02 (1989).

The claims were tried before the district court and Tropical prevailed. In

25

dismissing the claims, the district court found that Tropical merely recommended that Tall Pony contact Seven Seas to discuss obtaining coverage for the shipment and that Tropical was not acting as Seven Seas' agent when it made that recommendation. Because we conclude that the district court's findings under the agency and Restatement (Second) Torts § 323 theories of recovery were not clearly erroneous as a matter of law, we affirm the district court's dismissal of Tall Pony's claims. See Beck v. Prupis, 162 F.3d 1090, 1101 (11th Cir. 1998), aff'd, 529 U.S. 494 (2000). We elaborate.

It was Seven Seas, rather than Tropical, that Tall Pony contacted prior to the scheduled shipment date to confirm that it was adequately insured. Further, Tall Pony concedes that it checked on Seven Seas with its broker before it contracted with Seven Seas for ocean marine insurance coverage for its shipment. Similarly, Seven Seas, not Tropical, issued the letter to Tall Pony stating that Tall Pony was fully insured on its cargo. Thus, following its initial inquiry of Tropical, Tall Pony dealt primarily with Seven Seas in obtaining insurance coverage. Under these circumstances, Tall Pony cannot persuasively argue that Tropical undertook to obtain insurance coverage on behalf of Tall Pony for its cargo. See Klonis v. Armstrong, 436 So.2d 213, 216 (Fla. 1st Dist. Ct. App. 1983).

B. Seven Seas v. Tall Pony

Seven Seas challenges the district court's ruling that it is solely liable to Tall Pony under the terms of the Seven Seas insurance policy for $234,000, the amount paid by Fireman's Fund to Stageline and its insurers for the property

26

damage to the stage. Notably, Seven Seas does not dispute that its policy covered loss claims resulting from damage to the stage during ocean transport; rather, Seven Seas argues that the Fireman's Fund policy also insured Tall Pony for damage to the stage and, thus, the $234,000 should be allocated pro rata between Fireman's Fund and Stageline based on the terms of their respective policies. Seven Seas also contends that the district court erred in holding that Tall Pony is entitled to attorney's fees under Fla. Stat. § 627.428 in connection with its $234,000 damage award against Seven Seas. Tall Pony cross-appeals, arguing that the district court erred by limiting its damage recovery against Seven Seas to the amount of physical property loss to the stage. Specifically, Tall Pony argues that it is entitled to recover an additional $240,023, the difference between the amount paid by Fireman's Fund to satisfy its obligations to third parties and Tall Pony arising from the accident and the amount awarded by the district court to Tall Pony under the terms of the Seven Seas policy for the physical damage to the stage. This amount is principally comprised of additional expenses Tall Pony incurred to obtain a replacement stage and settlement of Any Event's loss of use claim against Tall Pony. We will consider the merits of these arguments seriatim.

1. The Seven Seas Policy

In concluding that the parties intended that only the Seven Seas policy afforded coverage for property damage to the stage occurring during ocean transport, the district court considered the deposition testimony of Jerome Anderson and Robert Sattler, the insurance agents who underwrote the Fireman's

27

Fund policy to Tall Pony, and Danny Harris, the head of production at Tall Pony. Anderson testified that he had informed Tall Pony that Fireman's Fund did not wish to insure risks associated with the "open seas" and, thus, that its policy did not cover the loading and transport of the stage. Tall Pony also relies on a letter from James McIntire, a vice president at Seven Seas, to Harris stating that the Seven Seas policy covered Tall Pony's cargo both to and from St. Maarten. McIntire sent the letter to Harris after Harris had expressed concern that Tall Pony lacked adequate coverage for the ocean transport of its cargo.

Following a bench trial on Tall Pony's claim against Seven Seas for breaching its obligations under the Seven Seas policy, in which the district court considered the testimony of the Anderson, Sattler and Harris and the letter from Seven Seas, the district court held that:

> Fireman's Fund said, we don't want to insure this [cargo] while it's on the open seas. We don't want to take the open cargo type of coverage. We're not very good at that and we just don't want to handle that coverage. Tall Pony says fine, I'll try to get other coverage. And they talk to the shipper, who is Tropical, and Tropical recommends its sister company, which is Seven Seas.

> So representatives at Tall Pony call Fireman's Fund and say, what about this company, are they any good? They check them out and they say yeah, they should be all right [sic], we'll write our coverage and we won't charge you for the coverage with regard to the open sea trip, the ocean cargo policy.

> Now, all of this seems to happen at the last minute. And, finally, Tall Pony doesn't have any indication of its insurance and so it calls Seven Seas and says, That thing isn't moving until I get some confirmation of coverage. That's the infamous letter which says you're covered for all risks.

> . . . .

> [T]he . . . first question the Court has to deal with is, did Fireman's

28

Fund provide any coverage for the maritime leg of this trip? The insurance company, one party to the contract, says we didn't write out any coverage, we didn't charge a premium that reflected that. The insured says they didn't provide any coverage and we didn't pay for that coverage. We paid somebody else for that risk.

. . . .

[W]ith regard to the incident in question, I would find that at the time the stage was dropped Fireman's Fund did not have coverage for that portion because that's the portion that was specifically assumed by Seven Seas and they picked up the coverage at that time.

. . . .

So if there is no insurance from Fireman's Fund, that leaves -- and Fireman's Fund has an assignment from Tall Pony and Tall Pony is the ultimate bailee of this, they had coverage with Seven Seas -- I would hold Seven Seas liable for the total amount of the property damage, which is $234,000.

The import of the district court's findings and conclusions of law was that Fireman's Fund was not liable for any claims arising out of the destruction of the stage and that Tall Pony's sole recourse was against Seven Seas under the terms of its "all risk" cargo policy. We disagree with the district court's reasoning on this issue.

The question of the extent of coverage under an insurance policy is a question of law to be decided by the court and is therefore subject to plenary review by this Court. See Gulf Tampa Drydock Co. v. Great Atl. Ins. Co., 757 F.2d 1172, 1174 (11th Cir. 1985); see also Coleman v. Florida Ins. Guar. Ass'n, 517 So.2d 686, 690 (Fla. 1988); Jones v. Utica Mut. Ins. Co., 463 So.2d 1153, 1157 (Fla. 1985).

The parties apparently agree that resolution of the instant dispute is governed by Florida law. See, e.g., Steelmet v. Caribe Towing Corp., 842 F.2d

1237, 1244 n.9 (11th Cir. 1988); Gulf Tampa Drydock Co., 757 F.2d at 1174 ("[A]dmiralty courts will generally look to appropriate state law in determining questions involving a marine insurance contract.") (citing Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 315-21 (1955)). Under Florida law, "the parties' intent is to be measured solely by the language of the policies unless the language is ambiguous." Towne Realty v. Safeco Ins. Co. of Am., 854 F.2d 1264, 1267 (11th Cir. 1988). Thus, in the absence of ambiguous language, a court may not look to parol evidence in ascertaining the intent of the parties to an insurance contract. See Moore v. Pa. Castle Energy Corp., 89 F.3d 791, 795 (11th Cir. 1996); Durham Tropical Land Corp. v. Sun Garden Sales Co., 138 So. 21, 23 (Fla. 1931) ("The intention of the parties to a contract is to be deducted from language employed, and such intention, when expressed, is controlling, regardless of intention existing in the minds of parties."); Lee v. Montgomery, 624 So.2d 850, 851 (Fla. 1st Dist. Ct. App. 1993) (per curiam) ("As a general rule, in the absence of some ambiguity, the intent of the parties to a written contract must be ascertained from the words used in the contract, without resort to extrinsic evidence."); see also 9 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 137:6 (1997) ("In harmony with the general principle of construction, a contract of marine insurance is not to be construed beyond the intent expressed in the policy as determined by the fair and ordinary meaning of its terms.") (footnotes omitted).

"[A]mbiguity exists in an insurance policy only when its terms make the contract susceptible to different reasonable interpretations, one resulting in

30

coverage and one resulting in exclusion." Gulf Tampa Drydock Co., 757 F.2d at 1174-75. We examine the language of the policy in its entirety, construing any ambiguity against the insurer. Id. at 1174; see also Gas Kwick v. United Pac. Ins. Co., 58 F.3d 1536, 1539 (11th Cir. 1995). We are mindful that "[c]ourts may not, however, rewrite contracts or add meaning to create an ambiguity, and an ambiguity is not invariably present when a contract requires interpretation." Gas Kwick, 58 F.3d at 1539. Because the instant appeal turns on the language in the Fireman's Fund and Seven Seas policies, we confine ourselves to the language in those policies to ascertain whether the policies are ambiguous with respect to the existence of ocean marine cargo coverage for the Tall Pony shipment. See Mindis Metals v. Transp. Ins. Co., 209 F.3d 1296, 1298 (11th Cir. 2000) (per curiam) ("As in any dispute over insurance coverage, the Court begins by examining the source of coverage itself -- the general promises of coverage made in the insurance policy.").

Section II, Coverage D of the Fireman's Fund insurance policy provides as follows:

I. INSURING AGREEMENT

We agree to pay to you or on your behalf the value of personal property, including but not limited to cameras, camera equipment, sound and lighting equipment, portable electrical equipment, mechanical effects equipment, grip equipment and mobile equipment, not including loss of use, owned by you or which is the property of others for which you are legally liable and which is lost, damaged or destroyed during the term of coverage, caused by the Perils Insured against, while such property is used or to be used by you in connection with an insured production.

The "Perils Insured" provision under Coverage D of the Fireman's Fund Policy

31

provides: "This coverage insures against <u>all</u> <u>risks</u> <u>of</u> <u>direct</u> <u>physical</u> <u>loss</u> <u>or</u> <u>damage</u> <u>to</u> <u>the</u> <u>property</u> <u>covered</u> <u>from</u> <u>any</u> <u>external</u> <u>cause</u>, <u>except</u> <u>as</u> <u>hereinafter</u> <u>excluded</u>" (emphasis added). Thus, under the plain language of these provisions, the Fireman's Fund policy provided Tall Pony coverage for physical damage to equipment it owned or leased from a third party, unless the property was specifically excluded or the damage was caused by an uninsured peril. Further, the policy limited Fireman's Fund liability for each loss under Coverage D to $2 million, with a per loss deductible of $1,500.

This brings us to the "Perils Not Insured" and "Property Excluded" sections in Coverage D of the Fireman's Fund policy. Notably, those sections do not exclude coverage for the mobile stage or ocean transport.[4] Further, Fireman's Fund and Tall Pony point to no language in the Fireman's Fund policy that is arguably ambiguous on its face. Accordingly, we conclude that, under the clear and unambiguous language contained in "the four corners" of the Fireman's Fund policy, <u>Vulcan Painters</u> v. <u>MCI Constructors</u>, 41 F.3d 1457, 1460 (11th Cir. 1995), the parties intended that Fireman's Fund would insure Tall Pony against loss on account of damage done to equipment, including, but not limited to, the mobile stage at issue, which Tall Pony was legally liable for at the time of the accident. Therefore, the district court erred in considering parol evidence in construing the scope of coverage afforded under the Fireman's Fund policy and

---

[4]    This reading is consistent with the testimony of Denise Denim, the Fireman's Fund adjuster for the Tall Pony claims. Ms. Denim testified that Fireman's Fund's payment of $234,000 in settlement of claims brought by Stageline and its insurers for damage to the stage was covered under Section II, Coverage D of the Fireman's Fund policy, which was "intended to pick up physical damage to property for which the insured is legally liable."

32

holding that Seven Seas was exclusively liable for Tall Pony's claimed loss arising from the property damage to the stage.

Seven Seas does not dispute that the coverage under its open cargo policy, which contained a $4 million limitation on liability, extended to property damage to the stage at the time of the accident. Indeed, the letter written by James McIntire on behalf of Seven Seas on the date of the accident confirms that conclusion. Thus, having determined that Fireman's Fund and Seven Seas are liable under the terms of their respective policies, we must next consider the impact of the mutual "other insurance" provisions contained in those policies.

The "other insurance" provision in the Fireman's Fund policy states: "If at the time of loss or damage any other insurance is available which would apply to the property in the absence of this policy, the insurance provided by this policy shall apply as excess insurance over the other insurance." The Seven Seas policy contains a similar provision: "If an interest insured hereunder is covered by other insurance which attached prior to the coverage provided by this policy, then this Company shall be liable only for the amount in excess of such prior insurance." The result of these competing "other insurance" clauses is settled under Florida law: "When two insurance policies contain `other insurance' clauses the clauses are deemed mutually repugnant and both insurers share the loss on a pro rata basis in accordance with their policy limits." Galen Health Care v. Am. Cas. Co. of Reading, Pa., 913 F.Supp. 1525, 1530 (M.D. Fla. 1996) (citing Travelers Ins. Co. v. Lexington Ins. Co., 478 So.2d 363, 365 (Fla. 5th Dist. Ct. App. 1985)); see also Rouse v. Greyhound Rent-a-Car, 506 F.2d 410, 415-16 (5th Cir. 1975)

33

(in applying Florida law, holding that "the [`other insurance'] clauses are mutually repugnant, since if both are given effect neither insurer would be liable"). Accordingly, the Fireman's Fund and Seven Seas "other insurance" clauses "cancel each other out and both insurers share the loss on a pro rated basis." Galen Health Care, 913 F.Supp. at 1530. Without the benefit of adequate briefing on this point, we leave it to the district court on remand to decide in the first instance the manner in which liability for the physical damage loss to the stage should be apportioned between Fireman's Fund and Seven Seas based on the scope of coverage provided under their respective policies. See, e.g., Clark v. Putnam County, 168 F.3d 458, 463 (11th Cir. 1999). Accordingly, we vacate the $234,000 damage award, plus prejudgment interest, against Seven Seas in connection with Tall Pony's claimed loss for property damage to the stage.

2. Tall Pony's Cross-Appeal for Consequential Damages

Tall Pony challenges the district court's ruling that the Seven Seas policy did not provide for consequential damages, comprised mainly of costs associated with settling Tall Pony's liability to Any Event and payments made by Tall Pony to obtain a replacement stage and transport it to St. Maarten where it was assembled. Specifically, Tall Pony claims that all of these costs, totaling $240,023, fall within the scope of coverage provided in the Seven Seas policy. We turn to the district court's resolution of Tall Pony's claim for consequential damages as our starting point.

In rejecting Tall Pony's claim for consequential damages, the district court reasoned:

I think that the language "all risks" in the context of shipping things by sea has to be construed in the terms of all risk of damage to the, all types of damage to the equipment. I don't believe that there was any indication here that they're saying we'll get paid for consequential damages.

If that were sought, it seems to me it would be incumbent upon Mr. Harris [of Tall Pony] to say not only do I want all kinds of coverage for all kinds of perils, but I want consequential damages too.

. . . .

[W]ith regard to . . . Tall Pony's contention that they had broader coverage than [the total amount of the property damage to the stage], I would think that there at least ought to be some document indicating that they were looking for broader coverage than that. I have read a lot of cases involving shipping and they always talk about an all-risk policy as being all risks of sea. You know, sinking. Anything. Act of God. Anything that can happen to it, including breakage. And I'm sure that that's exactly what they meant by that letter.

I have never seen nor have I heard of, with many of these maritime cases, somebody providing an open cargo coverage, interruption of business, and consequential damages. There would be no way that anybody could underwrite that, from a standpoint of saying, well, we're going to insure that your product isn't lost or damaged or unusable.

They could say, well, we were going to use that for this, and because we couldn't do that and this happened, that consequential damages could go into the gazillions.

We agree with the result reached by the district court, albeit for slightly different reasons.

The inherent flaw in Tall Pony's argument is its failure to distinguish between a risk or peril insured against under the insurance policy, i.e., the cause of the loss, and the damages or recovery sought as a result of the occurrence of that risk or peril. To view Tall Pony's argument, and the misconceptions that underlie that argument, in their proper context, we first briefly discuss certain general principles applicable to "all risk" policies.

35

In general, an "all risk" insurance policy provides coverage for the "primary risks to the ship of navigating on the waters." 9 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d at § 137:11; id. at § 137:10 ("As a general statement, the coverage under a marine insurance policy is presumed to apply to risks common to the sea or other navigable waters."). An "all risk" policy, such as the one present here, typically works in favor of the insured: "[o]nce the insured establishes a loss apparently within the terms of an `all risks' policy, the burden shifts to the insurer to prove that the loss arose <u>from</u> a <u>cause</u> <u>which</u> <u>is</u> <u>excepted</u>." <u>Nat'l Union Fire Ins. Co.</u> v. <u>Carib Aviation</u>, 759 F.2d 873, 875 (11th Cir. 1985) (per curiam) (emphasis added) (quotation marks omitted); <u>see</u> <u>also</u> <u>Int'l Ship Repair & Marine Servs.</u> v. <u>St. Paul Fire & Marine Ins. Co.</u>, 944 F.Supp. 886, 892 (M.D. Fla. 1996) (<u>Int'l Ship Repair</u>). This benefit to the insured applies, however, "only where what is at issue is the risk insured against in an all-risk policy." <u>Appalachian Ins. Co.</u> v. <u>United Postal Sav. Ass'n</u>, 422 So.2d 332, 333 (Fla. 3d Dist. Ct. App. 1982) ("Where, as here, the issue is not the risk, but the application of a deductible, then the fact that the instant policy happens to be an all-risk policy is totally immaterial.").

In contrast, an insurance policy may provide coverage for "named perils," where, for example, "the insured may purchase protection from a specific peril, such as fire, collision, or ice." 9 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d at § 137:11. In these cases, the insured may recover only if the loss was caused by one of the covered perils enumerated in the policy. <u>See</u>, <u>e</u>.<u>g</u>., <u>Steelmet</u>, 842 F.2d at 1242-43; <u>United States Fire Ins. Co.</u> v. <u>Cavanaugh</u>, 732

36

F.2d 832, 835 (11th Cir. 1984).

Cases involving an "all risk" insurance policy generally share a common theme: a determination of whether the claimed loss or damage was <u>caused</u> by a peril falling within the policy's coverage. <u>See</u>, <u>e.g.</u>, <u>Morrison Grain Co.</u> v. <u>Utica Mut. Ins. Co.</u>, 632 F.2d 424, 430 (5th Cir. 1980); <u>Atl. Lines Ltd.</u> v. <u>Am. Motorists Ins. Co.</u>, 547 F.2d 11, 13 (2d Cir. 1976) (holding that the average insured "would not believe that this was a risk or hazard against which he had insured when he purchased all risk insurance"); <u>Jewelers Mut. Ins. Co.</u> v. <u>Balogh</u>, 272 F.2d 889, 892 (5th Cir. 1959) ("The assured did not have to . . . demonstrate that [the] loss was <u>not</u> caused by one of the excepted conditions."); <u>Int'l Ship Repair</u>, 944 F.Supp. at 892; <u>Redna Marine Corp.</u> v. <u>Poland</u>, 46 F.R.D. 81, 86 (S.D.N.Y. 1969); <u>see</u> <u>also</u> 9 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § at 137:11 (noting that coverages under "all risk" marine insurance policies "address only what instrumentalities of the loss are covered"). This point is further illustrated by Webster's definition of the word "risk:" "someone or something that <u>creates</u> or <u>suggests</u> a hazard or adverse chance" or "the chance of loss or <u>the</u> <u>perils</u> <u>to</u> <u>the</u> <u>subject</u> <u>matter</u> <u>of</u> <u>insurance</u> <u>covered</u> <u>by</u> <u>a</u> <u>contract</u>." Webster's Third New International Dictionary 1961 (1993) (emphasis added). With these basic principles in mind, we examine the perils clause contained in the Seven Seas marine insurance policy, which governs our analysis.

The "Perils" clause contained in the Seven Seas policy provides:

Touching the adventures and perils [Seven Seas] is contented to bear, and takes upon itself, they are: of the seas, fire, assailing thieves, jettisons, barratry of the master and mariners, and all other like perils, losses and misfortunes, (illicit or contraband trade excepted in all cases)

37

> that have come to the hurt, detriment, or damage of the said goods and merchandise or any part thereof.

(emphasis added). The parties assert, and we agree, that the language in the clause is sufficient to demonstrate Seven Seas' intention "to provide `all risk' coverage to its insured." Int'l Ship Repair, 944 F.Supp. at 892. However, the plain import of the Perils clause is that it applies only to the ship's cargo, and not for damages "for loss of profits and expected use of a [piece of equipment] that is out of commission." 9 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d at § 137:11; cf. Nevers v. Aetna Ins. Co., 546 P.2d 1240, 1241 (Wash. Ct. App. 1976) (holding that an "all risks" yachtsman's hull policy was not broad enough to provide coverage for the loss of the boat due to defective title). While the Seven Seas policy limited Tall Pony's recovery to damage to its cargo, it did not make Tall Pony's recovery contingent on the occurrence of a specific peril as the cause of that damage. Accordingly, we hold that the plain language of the policy repudiates Tall Pony's contention that the Seven Seas policy is broad enough to include consequential damages. Further, Tall Pony cites no authority in support of its claim that consequential damages are recoverable as a matter of common industry practice in cases involving similar marine insurance policies. Because the Seven Seas policy is unambiguous on this point, we need not consider the McIntire letter in construing the scope of coverage afforded under the policy or as evidence of the coverage Tall Pony believed it had at the time of the accident. See Towne Realty, 854 F.2d at 1267; Nat'l Union Fire Ins. Co., 759 F.2d at 875-76.

To the extent Tall Pony argues that the parties intended the McIntire letter

to supplement or modify the coverage provided under the Seven Seas policy, this argument still fails to rescue Tall Pony's claim for consequential damages.

To view Tall Pony's claim in its proper context, we begin with the circumstances surrounding the issuance of the letter by Seven Seas. On the <u>same</u> day that Tropical was scheduled to ship the stage and Tall Pony's other equipment, Tall Pony became concerned that it lacked insurance coverage for its cargo. This prompted Harris to contact Seven Seas and request a written confirmation from Seven Seas that it was covered for the trip. In response, James McIntire, vice president at Seven Seas, issued a letter to Harris stating, in part, that "Tall Pony Productions is held covered on their cargo sailing from Port of Palm Beach to St. Maarten and on the return trip." Seven Seas' letter apparently quelled Tall Pony's concerns, as there was no further contact between the parties with respect to the letter. The accident that resulted in the damage to the stage occurred later that day.

In support of its contention that the McIntire letter is sufficiently broad to include a claim for consequential damages in connection with the damage to the stage, Tall Pony relies on the following excerpted language from that letter: "Coverage is all risk excluding any pre-existing discrepancies prior to receipt from Tropical Shipping." Even assuming that this isolated language represented the sum and substance of the McIntire letter and that the letter effectively modified the terms of the Seven Seas policy, it adds nothing to Tall Pony's claim. As we held above, under an "all risk" policy, an insured is entitled to recover for damage to its cargo regardless of the peril that caused that damage. The term

39

"all risk" does not, however, stand for the far broader application advanced by Tall Pony; namely, that an "all risk" policy permits an insured to recover for <u>all losses</u> or <u>damages</u> resulting from the accident.

Tall Pony's contention is further flawed because it reads that sentence in isolation of the remainder of the letter. Specifically, Tall Pony's selective treatment of the McIntire letter fails to include the following language from the preceding sentence: "Tall Pony Productions <u>is</u> <u>held</u> <u>covered</u> <u>on</u> <u>their</u> <u>cargo</u> sailing from Port of Palm Beach to St. Maarten" (emphasis added). Thus, read in its entirety, the McIntire letter supports Seven Seas' position that it intended to limit its policy coverage to Tall Pony's <u>cargo</u>. Moreover, given the timing and sequence of events that prompted issuance of the letter, we are not persuaded by Tall Pony's argument that the parties intended that letter to embody their intentions with respect to the parties' mutual obligations and the scope of coverage provided under the Seven Seas policy. Rather, the letter was intended to address Tall Pony's immediate concerns regarding proof of insurance for its shipment. To hold otherwise, we would have to stretch reality to conclude that the parties relied on a two-sentence letter, prepared with little or no negotiation, to encompass their entire insurance agreement. Accordingly, we affirm the district court's denial of Tall Pony's claim against Seven Seas for $240,023 in consequential damages arising out of the accident.[5]

3. <u>Award of Attorney's Fees Under Fla. Stat. § 627.428</u>

---

[5] Because the district court properly dismissed Tall Pony's failure to procure insurance claim against Tropical, Tropical cannot be liable for any consequential damages that may have resulted from the accident.

With little argument from the parties, the district court held, following the conclusion of the bench trial in Tall Pony II, that Tall Pony, "as an insured suing its insurance company," was entitled to attorney's fees in connection with its damage award against Seven Seas. The district court did not, however, make a specific award of attorney's fees at that time. In a Final Judgment dated March 6, 2000, the district court awarded Tall Pony attorney's fees in the amount of $76,912.50, along with prejudgment interest. On appeal, Seven Seas does not challenge the amount of attorney's fees awarded to Tall Pony, but rather, Tall Pony's entitlement to attorney's fees in connection with its $234,000 damage award against Seven Seas. Specifically, Seven Seas argues that Fireman's Fund, rather than Tall Pony, is the real party-in-interest and, thus, the present dispute is actually between two insurance companies. We agree, and therefore vacate the district court's award of attorney's fees made pursuant to Fla. Stat. § 627.428.

We review de novo the legal question of whether Tall Pony is entitled to an award of attorney's fees pursuant to Fla. Stat. § 627.428. See Weisberg, 222 F.3d at 1310.

Our vacatur of the $234,000 damage award against Seven Seas requires that we also vacate the award of attorney's fees against Seven Seas in connection with that damage award. Simply put, an award of attorney's fees cannot stand absent a judgment in favor of the insured. See Fla. Stat. § 627.428(1) ("Upon the rendition of a judgment . . . against an insurer and in favor of any named or omnibus insured . . . the trial court . . . shall adjudge or decree against the insurer and in favor of the insured [reasonable attorney's fees]."). However, because we

41

hold today that both the Fireman's Fund and Seven Seas insurance policies provide coverage for the property damage to the stage at the time of the accident, we will consider now the question whether Tall Pony is entitled to any award of attorney's fees based on the district court's determination on remand of Seven Seas' pro rata share of the claimed loss for the physical damage to the stage. See Steelmet, 842 F.2d at 1245 ("[A]n insured is entitled to an award of fees even where both parties obtain some relief in the appellate court."). As a threshold question, we must first determine whether state or federal maritime law governs.

In Weisberg, we considered the question of whether federal or state law governs an application for attorney's fees in the context of a marine insurance contract dispute. See Weisberg, 222 F.3d at 1312. In that case, the insurance company argued that Fla. Stat. § 627.428 conflicted with established maritime law, which "prohibit[s] any award of attorney's fees in an admiralty action absent a contract provision, a federal statute, or bad faith in the litigation process." Id. We disagreed, noting that "[t]his circuit has awarded attorney's fees pursuant to Fla. Stat. § 627.428 in a number of marine insurance contract disputes." Id. at 1313. We viewed the consistent application of state law in this context as "implicitly hold[ing] that there exists no specific and controlling federal law relating to attorney's fees in maritime insurance litigation." Id. Accordingly, we expressly held that "a district court may award attorney's fees pursuant to Fla. Stat. § 627.428 against an insurer in a maritime insurance contract case." Id. at 1315.

Having determined that the district court did not err in relying on Fla. Stat.

42

§ 627.428 as a basis for awarding attorney's fees, we turn to the substantive question at hand: whether the district court properly applied Fla. Stat. § 627.428 based on the specific facts and circumstances present in this case.

Fla. Stat. § 627.428(1) provides:

> Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer, the trial court or, in the event of an appeal in which the insured or beneficiary prevails, the appellate court shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had.

Broadly read, section 627.428 "provides attorney's fees to an insured that obtains a judgment against an insurer." Ins. Co. of N. Am. v. Lexow, 937 F.2d 569, 572 (11th Cir. 1991). However, because "[s]ection 627.428 is in the nature of a penalty against an insurer who wrongfully refuses to pay a legitimate claim," we strictly construe its language. Great Southwest Fire Ins. Co. v. DeWitt, 458 So.2d 398, 400 (Fla. 1st Dist. Ct. App. 1984) (citing Lumbermens Mut. Ins. Co. v. Am. Arbitration Ass'n, 398 So.2d 469, 471 (Fla. 4th Dist. Ct. App. 1981)); see also Lexow, 937 F.2d at 573; id. at 572 (noting that the purpose of section 627.428 is to (1) "discourage contesting of valid claims of insureds against insurance companies," and (2) "reimburse successful insureds reasonably for their outlays for attorney's fees when they are compelled to defend or to sue to enforce their contracts") (quoting Wilder v. Wright, 278 So.2d 1, 3 (Fla. 1973)). "[I]ndividuals entitled to recover attorney's fees under section 627.428(1) are either `an insured or the named beneficiary under a policy or contract executed by the insurer,'" Lexow, 937 F.2d at 573 (quoting Indus. Fire & Cas. Ins. Co., v.

43

Prygrocki, 422 So.2d 314, 316 (Fla. 1982)), and the statute "authoriz[es] the recovery of attorney's fees from the insurer only when the insurer has wrongfully withheld payment of the proceeds of the policy." Lumbermens Mut. Ins. Co., 398 So.2d at 471 (quotation marks omitted). "The paramount condition is the entry of a judgment against the insurer and in favor of the insured." Lexow, 937 F.2d at 573 (quotation marks omitted).

Seven Seas concedes that Tall Pony was a named assured under the Seven Seas policy and that the policy is "all risk" and covers Tall Pony's claimed loss for the physical damage to the stage. We also note that Tall Pony is listed as the plaintiff in the action against Seven Seas seeking to recover for the loss arising from the damage to the stage. The parties' dispute focuses on the significance of the loan receipt executed by Fireman's Fund and Tall Pony, and, more importantly, whether the present dispute is in substance an action between two insurance companies, to wit, Fireman's Fund and Seven Seas.

The loan receipt provides, in pertinent part, that Tall Pony receives the sum of $474,023 from Fireman's Fund

> as a loan and not as payment of any claim, repayable only out of any net recovery [Tall Pony] may make from any vessel, carrier, bailee, or others upon or by reason of any claim for the loss of or damage to the [stage], or from any insurance effected by [Tall Pony] . . . and as security for such payment we hereby pledge to [Fireman's Fund] all such claims and any recovery thereon.

> In further consideration of the said advance, . . . we hereby appoint the agents and officers of [Fireman's Fund] . . . with irrevocable power to collect [on] such claim[s] and to begin, prosecute, compromise or withdraw, in [Tall Pony's] name, but at the expense of [Fireman's Fund], any and all legal proceedings which [it] may deem necessary to enforce such claim or claims, and to execute in our name any documents which may be necessary to carry into effect the purposes of this

44

agreement.

> We hereby ratify, approve and confirm the filing and maintenance of any suits . . . in our name . . . for recovery of any damages with respect to said shipments.

The loan receipt covered payments made by Fireman's Fund in settlement of claims brought by Any Event and Stageline, as well as payments made directly to Tall Pony for expenses incurred in obtaining a replacement stage. Seven Seas argues that the timing and circumstances surrounding the execution of the loan receipt demonstrate that Tall Pony was not the real party-in-interest in the action against Seven Seas. We agree.

Fireman's Fund and Tall Pony executed the loan receipt approximately ten months after Fireman's Fund tendered the $234,000 payment to settle the suits initiated by Stageline and its insurers for the damage to the stage. More notably, the remaining payments that comprise the balance due under the loan receipt were made during 1995 (with the exception of a $2,175 audit expense), some three years before the loan receipt was executed. See id. During that three year period, Tall Pony proffered no consideration for the payments made by Fireman's Fund directly to Tall Pony and on its behalf, and Fireman's Fund did not seek a subrogation of Tall Pony's rights or a reservation of its rights in exchange for those payments. In addition, both Fireman's Fund and Tall Pony were represented by the same attorney, and that attorney was compensated by Fireman's Fund. Under these circumstances, we conclude that the loan receipt masks "the true nature of this action," Utica Mut. Ins. Co. v. Pa. Nat'l Mut. Cas. Ins. Co., 639 So.2d 41, 43 (Fla. 5th Dist. Ct. App. 1994), which was one "solely

between two insurers rather than a subrogation action." Id.

An examination of the various judgments entered by the district court in the Seven Seas action reinforces our conclusion.

To further support its position that Fireman's Fund was the real party-in-interest in the action against Seven Seas, Seven Seas maintains that the district court entered judgment in favor of Fireman's Fund, which is neither a "named or omnibus insured or the named beneficiary" under the Seven Seas policy, Fla. Stat. § 627.428, and, therefore, Tall Pony is not entitled to an award of attorney's fees under that section. This argument is not without force, as both the October 14, 1999 Final Judgment and the December 9, 1999 Amended Final Judgment state that "FINAL JUDGMENT IS HEREBY ENTERED for the plaintiff, Fireman's Fund, for the use and benefit of Tall Pony." Further, during the bench trial in Tall Pony I, the district court commented that, in cases such as the present action, "the real party in interest is the insurance company who paid the loss and is looking to pass their loss off on the party who created the damage. . . . [T]he real party . . . was the insurance company who [provided insurance] . . . for the use and benefit of [the insured]." We note, however, that in the Final Judgment Awarding Attorney's Fees entered on March 6, 2000, the district court awarded $76,912.50, plus interest, "in favor of Plaintiff, Tall Pony Productions, Inc."

Notwithstanding the language employed by the district court in the March 6, 2000 judgment, and that Tall Pony was identified as the plaintiff in the action commenced against Seven Seas, we conclude that Fireman's Fund was the real party-in-interest in that action. Accordingly, we hold that Tall Pony is not

46

entitled to any award of attorney's fees in connection with the judgment entered by the district court on remand against Seven Seas for its pro rata share of Tall Pony's claimed loss for the physical damage to the stage. Because we reverse the district court's award of attorney's fees in favor of Tall Pony, we conclude that an award of appellate attorney's fees to Tall Pony pursuant to Fla. Stat. § 59.46 would be improper. See Fla. Stat. § 59.46 (providing for the payment of attorney's fees "to the prevailing party on appeal").

C. Tropical's Motion for Costs

Finally, Tropical challenges the district court's vacatur of its award of costs against Tall Pony in the amount of $1,894.45.

Rule 54(d) of the Federal Rules of Civil Procedure provides that a prevailing party is entitled to an award of costs. See Fed. R. Civ. P. 54(d)(1) ("Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."); see also EEOC v. W&O, Inc., 213 F.3d 600, 620 (11th Cir. 2000). The costs that a prevailing litigant is entitled to under Rule 54(d) are enumerated in 28 U.S.C. §§ 1821 and 1920. See Crawford Fitting Co. v. J.T. Gibbins, Inc., 482 U.S. 437, 445 (1987).

"We review the factual findings underlying a district court's determination regarding prevailing party status for clear error." Head v. Medford, 62 F.3d 351, 354 (11th Cir. 1995) (per curiam). "Whether the facts as found suffice to render the plaintiff a 'prevailing party' is a legal question reviewed de novo." Id.

47

(quotation marks omitted). We review a district court's determination with respect to the denial of an award of costs for abuse of discretion. See Chapman v. AI Transp., 229 F.3d 1012, 1039 (11th Cir. 2000) (en banc); W&O, Inc., 213 F.3d at 620; see also Cavaliere v. Allstate Ins. Co., 996 F.2d 1111, 1115 (11th Cir. 1993) (appellate court reviews a district court's denial of relief under Fed. R. Civ. P. 60(b) for relief from a judgment or an order under the abuse of discretion standard).

"[A]lthough the district court has discretion to deny a prevailing party costs, such discretion is not unfettered." Head, 62 F.3d at 354. Thus, "where the trial court denies the prevailing party its costs, the court must give a reason for its denial of costs so that the appellate court may have some basis upon which to determine if the trial court acted within its discretionary power." Id. (quotation marks omitted); see also Chapman, 229 F.3d at 1039 (holding that "a district court must have and state a sound basis" for denying an award of costs to a prevailing party).

This brings us to the definition of a "prevailing party" adopted by this Court in Head:

> To be a prevailing party [a] party need not prevail on all issues to justify a full award of costs, however. Usually the litigant in whose favor judgment is rendered is the prevailing party for purposes of rule 54(d). . . . A party who has obtained some relief usually will be regarded as the prevailing party even though he has not sustained all his claims. . . . Cases from this and other circuits consistently support shifting costs if the prevailing party obtains judgment on even a fraction of the claims advanced.

62 F.3d at 354 (internal citations omitted). Against these settled principles, we review the district court's application of Rule 54(d) to the present circumstances.

48

Because the manner in which Tall Pony's failure to procure insurance claim against Tropical was resolved is relevant to the district court's denial of costs in favor of Tropical, we briefly discuss the various actions and proceedings before the district court.

Tall Pony brought two separate actions: one alleging a total of nine claims against Tropical, Birdsall, Bromma and  Stageline, and the Tropic Tide, in rem (Tall Pony I), and one against Seven Seas (Tall Pony II), both arising from the damage to the stage at the time it was being loaded onto the Tropic Tide.  These actions resulted in two separate bench trials before the district court.  In Tall Pony I, Tall Pony brought four causes of action against Tropical: breach of contract (count I), bailment (count II), failure to provide insurance (count IIA) and negligence (count IV).  In Tall Pony II, Tall Pony brought a breach of insurance contract action against Seven Seas seeking damages for the destruction of the stage and attorney's fees.

In the first bench trial, the district court ruled in Tall Pony's favor, concluding that Tropical and Birdsall were liable for the damage to the stage, but limited Tall Pony's recovery to $500 under COGSA section 1304(5).  The failure to procure insurance claim against Tropical was consolidated for discovery purposes with the Seven Seas action, and tried during the second bench trial along with the breach of insurance contract claim against Seven Seas.  Tropical ultimately prevailed against Tall Pony on its failure to procure insurance claim, a decision we now affirm on appeal.

In its decision initially awarding costs, the district court stated that

"Tropical is the 'prevailing party' with regard to the insurance matter, which was initially a separate case and claim subsequently consolidated." However, as the district court clarified on reconsideration, the failure to procure insurance claim was alleged as count IIA in the nine count complaint brought by Fireman's Fund and Tall Pony against Tropical, Birdsall, Bromma and Stageline. The district court went on to hold that Tall Pony, rather than Tropical, was the "prevailing party" in Tall Pony I for purposes of Rule 54(d):

> [T]he fact that Tropical successfully defended itself against Count IIA does not transform it into the prevailing party. Rather, as the plaintiffs correctly argue, although they did not prevail on all of the counts asserted against Tropical, they are nonetheless the prevailing party in the single case wherein plaintiffs sued Tropical.

(emphasis added). Viewed this way, we cannot conclude that the district court's determination that Tropical was not a "prevailing party" in the Tropical action for purposes of Rule 54(d) was clearly erroneous. Accordingly, the district court did not abuse its discretion in vacating its initial award of costs in favor of Tropical in connection with the dismissal of Tall Pony's failure to procure insurance claim.

## CONCLUSION

We have considered the remaining arguments raised by the various appellants and find them to be without merit. For the foregoing reasons, we AFFIRM the decision of the district court in part and REVERSE and REMAND in part, as follows: (1) we affirm the district court's holding that the limitation on liability under COGSA section 1304(5) applied to the claims against Tropical and Birdsall, as well as its dismissal of the failure to procure insurance claim against

50

Tropical; (2) we REVERSE the district court's holding that Seven Seas is solely liable for the physical damage loss to the stage and, therefore, VACATE the $234,000 damage award, plus interest, against Seven Seas in connection with that claimed loss; (3) we REMAND this matter for the district court to determine the manner in which Tall Pony's claim for physical damage loss to the stage should be apportioned between Fireman's Fund and Seven Seas under the terms and coverage limits provided in their respective policies; (4) we AFFIRM the district court's holding that Tall Pony is not entitled to consequential damages under the Seven Seas policy; (5) we REVERSE the district court's award of attorney's fees in favor of Fireman's Fund/Tall Pony and against Seven Seas and deny Tall Pony's claim for costs on appeal pursuant to Fla. Stat. § 59.46; and (6) we further REMAND the case to the district court with instructions to modify its various judgments and for further proceedings consistent with this opinion.